NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200425-U

NOS. 4-20-0425, 4-20-0426 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 11, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 18JA112 |
| v.      (No. 4-20-0425) | ) | |
| Angelina C., | ) | |
| Respondent-Appellant). | ) | |
| ———————————————————————— | ) | |
| *In re* M.C., a Minor | ) | |
| | ) | No. 20JA5 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-20-0426) | ) | Honorable |
| Angelina C., | ) | J. Brian Goldrick, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding it was in J.C.'s best interest to terminate respondent's
parental rights was not against the manifest weight of the evidence, and this court
lacks jurisdiction of the issue of cochlear implants for M.C.

¶ 2    In McLean County case No. 18-JA-112 (hereinafter case 112), the State in

January 2020 filed a motion for the termination of the parental rights of respondent, Angelina C.,

as to her minor child, J.C. (born in November 2018). Respondent made an admission to one

ground of unfitness. After an August 2020 hearing, the McLean County circuit court found it

was in J.C.'s best interest to terminate respondent's parental rights.

¶ 3 In McLean County case No. 20-JA-5 (hereinafter case 5), the State filed a petition

for adjudication of wardship as to M.C. (born in February 2020), the minor child of respondent,

asserting M.C. was neglected. At a March 2020 adjudicatory hearing, respondent admitted M.C.

was neglected based on the first allegation in the petition. After an August 2020 hearing, the

McLean County circuit court (1) found respondent unfit to care for M.C., (2) made M.C. a ward

of the court, and (3) placed M.C.'s custody and guardianship with the Department of Children

and Family Services (DCFS). The dispositional order also provided respondent was to "receive

sufficient and adequate notice and the opportunity to participate in any and all medical

appointments and other medical discussions regarding cochlear implants for [M.C.]"

¶ 4 Respondent appeals the August 2020 judgments in the two cases, asserting the

circuit court erred by (1) concluding it was in J.C.'s best interest to terminate respondent's

parental rights and (2) allowing cochlear implants for M.C. that were not in M.C.'s best interest.

We affirm.

¶ 5                                    I. BACKGROUND

¶ 6 The minor children's fathers are not parties to this appeal.

¶ 7                                    A. Case 112

¶ 8 In November 2018, the State filed a petition for the adjudication of wardship of

J.C. The petition alleged J.C. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court

Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because his

environment was injurious to his welfare when he resided with (1) respondent because she had

been involved in a prior juvenile court case in which her parental rights to a prior born child were

terminated (count I) and (2) Spenser M. because he had been involved in a prior juvenile court

case in which his parental rights to a prior born child were terminated (count II). The next day,

the circuit court held a shelter care hearing and granted DCFS temporary custody of J.C. At a January 15, 2019, hearing, respondent admitted J.C. was neglected as alleged in the first count, and the circuit court accepted the admission and struck the second count. That same day, the first service plan was filed and had a date of December 26, 2018. The service plan provided objectives for respondent in the following areas: domestic violence, substance abuse, mental health, parenting, employment, housing, visitation, and cooperation. Regarding mental health, the service plan required respondent to do the following: (1) work with her counselor to develop an appropriate treatment plan and coping mechanisms, (2) openly and honestly participate in any recommended counseling sessions, (3) openly and honestly participate in a mental health assessment, (4) follow the recommendations of a mental health assessment, and (5) attend all scheduled appointments consistently and on time.

¶ 9 At a February 2019 hearing, the circuit court entered a dispositional order finding respondent was unfit to care for, protect, train, or discipline J.C. The order noted respondent continued to abuse marijuana, failed to screen randomly as requested, and was dropped from substance abuse treatment due to poor attendance. It also stated concerns about respondent's relationship with Spenser. Additionally, the court noted respondent's individual counseling was ongoing, respondent had just started parenting classes, and the results of respondent's domestic violence assessment was pending. The court made J.C. a ward of the court and appointed DCFS as J.C.'s guardian and custodian.

¶ 10 On May 2, 2019, the integrated assessment was filed. The assessment noted respondent was interviewed on January 28, 2019. The assessment listed respondent's four mental health diagnoses and the psychotropic medications she was taking at the time of her interview. Respondent also attended individual therapy for one hour a week.

¶ 11 In January 2020, the State filed a motion to terminate respondent's parental rights to J.C. The petition asserted respondent was unfit because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to J.C.'s welfare (750 ILCS 50/1(D)(b) (West Supp. 2019)); (2) make reasonable efforts to correct the conditions that were the basis for the removal of J.C. from respondent during any nine-month period following the neglect adjudication, namely April 21, 2019, to January 21, 2020 (750 ILCS 50/1(D)(m)(i) (West Supp. 2019)); and (3) make reasonable progress toward J.C.'s return during any nine-month period after the neglect adjudication, specifically April 21, 2019, to January 21, 2020 (750 ILCS 50/1(D)(m)(ii) (West Supp. 2019)).

¶ 12                                    B. Case 5

¶ 13 In February 2020, the State filed a petition for the adjudication of wardship of M.C. The petition alleged M.C. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West Supp. 2019)) because her environment was injurious to her welfare when she resided with respondent because respondent (1) had been involved in a concurrent juvenile court case in which she had yet to attain a finding of fitness and had made minimal progress on her services (count I), (2) had been involved in a prior juvenile court case in which her parental rights to a prior born child were terminated (count II), and (3) had unresolved issues of substance abuse and/or alcohol abuse (count III). The petition also alleged M.C. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West Supp. 2019)) because her environment was injurious to her welfare when she resided with Spenser because he had been involved in a prior juvenile court case in which his parental rights to a prior born child were terminated (count IV).

¶ 14 In April 2020, the State filed a motion for a finding regarding cochlear implants

for the minor. The motion noted M.C. had been diagnosed as profoundly hard of hearing in both ears. At a March 2020 appointment, Dr. Ryan Porter found M.C. had sensorineural hearing loss of both ears and discussed cochlear implants with respondent and the foster parents. Respondent expressed concern and disagreement with M.C. having cochlear implants. Dr. Porter explained imaging for the cochlear implants would need to be discussed around 8 months of age with the goal of implantation of the cochlear implants around 10 to 12 months of age. Dr. Porter also noted delaying implantation would cause significantly worse speech/language development outcomes. Jean Thomas, an audiologist and part of a team of hearing/speech providers for M.C., was working with the medical team to reach a recommendation regarding cochlear implants by eight months of age. The motion recognized the guardian of a minor has the authority to consent to major medical treatment under section 1-3(8)(a) of the Juvenile Court Act (705 ILCS 405/1-3(8)(a) (West 2018)). The State requested the circuit court make findings regarding cochlear implants for M.C. To the motion, the State attached the following: (1) the results of M.C.'s hearing test, (2) a consultation report done by Dr. Porter, (3) the notes and research done by the foster parents regarding cochlear implants, and (4) a letter from Thomas recommending cochlear implants for M.C. by eight months of age.

¶ 15                         C. Joint Proceedings

¶ 16         On March 31, 2020, the circuit court held a hearing in both cases. In case 112, respondent admitted she was unfit based on her failure to make reasonable efforts to correct the conditions that were the basis for the removal of J.C. from respondent during any nine-month period following the neglect adjudication, namely April 21, 2019, to January 21, 2020 (750 ILCS 50/1(D)(m)(i) (West Supp. 2019)). The circuit court accepted the admission and dismissed the other two counts. In case 5, respondent admitted M.C. was neglected as alleged in count I. The

court accepted the admission and dismissed the other three counts.

¶ 17       On August 19, 2020, the circuit court held a joint hearing. In case 112, the court held the best interest hearing. In case 5, the court held the dispositional hearing and addressed the State's motion for a finding regarding cochlear implants for M.C.

¶ 18       As to J.C.'s best interest, the State presented the best interest reports and the testimony of J.C.'s foster parents, Rebecca and Joseph M. It also asked the court to take judicial notice of the court file in case 112 and the dispositional reports in case 5. The best interest reports of both the case manager and the Court Appointed Special Advocate (CASA) recommended the termination of respondent's parental rights. Respondent testified on her own behalf and presented the testimony of Karen Swineford, respondent's recovery therapist. Additionally, respondent presented two exhibits showing her successful completion of a domestic violence offender's program and substance abuse treatment and her effort over the past few months in addressing her mental health concerns and working on her treatment plan goals.

¶ 19       Rebecca testified J.C. had lived in her home since he was 2 days old and J.C. was then 21 months old. Rebecca and her husband had three other children whom they adopted through foster care, including J.C.'s half-brother. Joseph worked as an electrician, and Rebecca stayed home to care for the children. J.C. was very bonded with Rebecca, Joseph, and the other children in their home. Rebecca described J.C. as a "very easy-going child" with a "really happy demeanor." She also noted he was very busy. Moreover, Rebecca testified J.C. had been diagnosed with Xq28 Duplication Syndrome, which his half-brother also has. All the known cases of males with the syndrome are severely affected and do not reach independence in adulthood. Males often have low muscle tone, balance issues, and can lose their ability to walk. They are usually mentally handicapped and may have seizures, autism, and mental illness. As a

result of the diagnosis, J.C. was being seen through Early Intervention for speech, occupational, developmental, and physical therapies. Absent the pandemic, he would have weekly speech therapy and receive quarter evaluations for the other therapies. J.C. also had yearly appointments with a geneticist and a pediatric cardiologist and would soon see a developmental pediatrician. J.C. also had hearing loss.

¶ 20　　　　　Rebecca further testified she and Joseph intended to adopt J.C. if he became available for adoption. She felt it was in J.C.'s best interest to remain in her home. Rebecca explained J.C. was well-adjusted in her home, and she and Joseph were very well equipped to meet J.C. needs. They had a firm understanding of what J.C.'s "outcomes" would likely be and had experience since they are raising his half-brother. Rebecca also noted J.C. was very attached to her family. Additionally, Rebecca testified she and Joseph had maintained a relationship between J.C.'s half-brother and respondent over the last five years and would do the same for J.C. M.C. lived with Rebecca's sister. J.C. was aware M.C. was his sister and was bonded with her. Rebecca felt it was important for the children to have a connection with their birth family.

¶ 21　　　　　Joseph agreed with his wife's testimony and confirmed his desire to adopt J.C.

¶ 22　　　　　Swineford testified she worked for the Center for Human Services as a recovery therapist and case manager. Respondent had been her client since July 2019, and they met once a week. Swineford set up goals with respondent, which were the following: (1) medication management, treatment, and compliance; (2) mood stability; (3) sleep; (4) attainment of community resources as needed; (5) controlling impulsivity; (6) "maintaining regulation;" and (7) finishing out her treatment plan with the Baby Fold. According to Swineford, respondent's progress has been good. Respondent had consistently improved with time management, sleep, mood regulation, making appointments, communicating effectively, and attending case

management and other appointments. Swineford also testified respondent had been able to successfully manage her medications over the last four to five months. Swineford had also seen a lot of honesty from respondent, including taking responsibility for the mistakes she had made. Respondent had also been advocating for herself and her children. Additionally, Swineford testified about respondent's severe and persistent mental health issues. Mental health was an ongoing daily focus for respondent.

¶ 23    Respondent admitted she had issues in the past that affected her ability to safely parent her children. She was working on services required by DCFS to eliminate the safety concerns. In August 2020, respondent had completed a six-month program of domestic violence counseling that included 24 sessions. She had also successfully completed parenting classes in 2019. Respondent acknowledged she had a lapse with substance abuse in June 2020 and admitted the lapse to her substance abuse counselor and caseworker. She also admitted she had not been consistent with drug drops due to irresponsibility and life circumstances. Respondent's mode of transportation is the public bus, which had been difficult to utilize during the pandemic. On cross-examination, respondent admitted she also had lapses in January, March, and July 2020.

¶ 24    Respondent described her visits with J.C. both on the cellphone and in person. During visits, she taught J.C. sign language. Respondent had three deaf family members, and respondent and many of her family members were fluent in American Sign Language. Respondent also had several visits with both J.C. and M.C. J.C. tries to be a big brother to M.C. All of the visits went well.

¶ 25    As to cochlear implants, respondent testified she believed they were in M.C.'s best interest in time. She believed M.C. would have the best opportunities in life with or without

the implants. Respondent further testified the cochlear implants could improve opportunities for M.C. but it was not guaranteed. Respondent had attended some medical appointments for M.C. However, as a result of the pandemic, only one person could attend medical appointments, and respondent could not attend M.C.'s appointments since the pandemic began.

¶ 26 Respondent further testified she could now be a very good mother to J.C. She was stable, had an appropriate home and income, and was dealing with her mental health issues. Respondent further testified she could get J.C. to appointments and take care of all his needs. Respondent testified she had thought about his medical needs and could provide the required care. Respondent felt she had the tools to be a mother to J.C. and M.C.

¶ 27 The State asserted (1) respondent's parental rights should be terminated, (2) both of M.C.'s parents were unfit, and (3) the circuit court should find it was in M.C.'s best interest to have the cochlear implants. Respondent asserted (1) it was not in J.C.'s best interest to terminate her parental rights, (2) she was fit to care for M.C., and (3) the State's motion should be denied and the surgery barred while M.C. is in foster care unless both biological parents consent. M.C.'s father admitted he was unfit but asked the State's motion regarding the cochlear implants be denied. The guardian *ad litem* recommended (1) respondent's parental rights be terminated, (2) respondent be found unfit in M.C.'s case, and (3) it was M.C.'s best interest to give DCFS the authority to consent to the surgery for the cochlear implants if it finds the implants to be medically prudent and in M.C.'s best interest and health.

¶ 28 After weighing the best interest factors, the circuit court found it was in J.C.'s best interest to terminate respondent's parental rights. It also found respondent unfit to care for M.C., made M.C. a ward of the court, and appointed DCFS as her guardian. In ruling on both issues, the court commended the progress respondent made in the three months prior to the

hearing. Regarding the cochlear implants for M.C., the court noted it had appointed DCFS as M.C.'s guardian with the authority to consent to major medical treatment and surgical care. As such, DCFS had the authority to consent to the cochlear implants if they are deemed in M.C.'s best interest. The court did not find the issue was ripe and emphasized it was not ordering M.C. receive the implants. Thus, it scheduled a status hearing for October 5, 2020, on the cochlear implant issue. The court also noted respondent and M.C.'s father should be allowed to participate in some form in the meetings on M.C.'s medical care.

¶ 29       On September 3, 2020, respondent filed a joint notice of appeal from the court's judgments on August 19, 2020, in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of the appeals in both cases pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 30                              II. ANALYSIS

¶ 31                              A. Case 112

¶ 32       Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2018)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West Supp. 2019)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interest that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004). In this case, respondent admitted one ground of unfitness. On

- 10 -

appeal, respondent only challenges the circuit court's best interest determination.

¶ 33    Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's best interest determination unless it is contrary to the manifest weight of the evidence. See *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 517 (2005).

¶ 34    During the best interest hearing, the circuit court focuses on "the child's welfare and whether termination would improve the child's future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). In doing so, the court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)) in the context of the child's age and developmental needs. See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include the following: the child's physical safety and welfare; the development of the child's identity; the child's family, cultural, and religious background and ties; the child's sense of attachments, including continuity of affection for the child, the child's feelings of love, being valued, security, and familiarity, and taking into account the least disruptive placement for the child; the child's own wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives; the uniqueness of

- 11 -

every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 35    We note a parent's unfitness to have custody of his or her children does not automatically result in the termination of the parent's legal relationship with the children. *In re M.F.*, 326 Ill. App. 3d 1110, 1115, 762 N.E.2d 701, 706 (2002). As stated, the State must prove by a preponderance of the evidence the termination of parental rights is in the minor children's best interest. See *D.T.*, 212 Ill. 2d at 366, 818 N.E.2d at 1228. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 36    Respondent contends the circuit court's best interest determination was against the manifest weight of the evidence because (1) the casework provided to respondent was not appropriate and reasonably calculated to facilitate the achievement of the permanency goal and (2) respondent was punished for the same conduct alleged during the fitness portion of the proceedings.

¶ 37                    1. *Casework*

¶ 38    Respondent's first contention is convoluted and appears to attempt to raise a constitutional violation based on the actions of the agency. The State contends she waived her first argument because she stipulated to a finding of unfitness. In reply, respondent disagrees, asserting the State's waiver argument is absurd and the State fails to distinguish the cases she cites. We agree with the State's suggestion service plans are generally addressed at the fitness hearing, which focuses on the respondent parent's actions. Regardless, the actions of the agency respondent complains about occurred before the dispositional order.

¶ 39    Dispositional orders in neglect and abuse cases are regarded as final and

appealable as of right.  *In re Leona W.*, 228 Ill. 2d 439, 456, 888 N.E.2d 72, 81 (2008).  Appeals from final judgments entered in neglect and abuse proceedings under the Juvenile Court Act are governed by the rules applicable to civil cases.  *Leona W.*, 228 Ill. 2d at 456, 888 N.E.2d at 81.  The applicable rule is Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).  For an appeal under Rule 301, the notice of appeal must be filed within 30 days after entry of the final judgment from which the appeal is being taken or 30 days after entry of the order disposing of any posttrial motions which may have been filed.  *Leona W.*, 228 Ill. 2d at 456-57, 888 N.E.2d at 81 (citing Illinois Supreme Court Rule 303(a)(1) (eff. May 1, 2007)).  When such a notice of appeal has not been filed, any error pertaining to the dispositional and adjudicatory orders has been forfeited, and the appellate court has no jurisdiction to go back and reconsider the dispositional order.  *Leona W.*, 228 Ill. 2d at 457, 888 N.E.2d at 81-82.

¶ 40          By failing to timely appeal the dispositional order, respondent forfeited her opportunity to challenge any alleged irregularities in the proceedings occurring prior to the entry of the February 20, 2019, dispositional order, which would have included the initial service plan filed on January 15, 2019.  See *Leona W.*, 228 Ill. 2d at 456-57, 888 N.E.2d at 81-82 (finding forfeited any errors in the proceedings pertaining to the dispositional and adjudicatory orders by failing to file a timely notice of appeal therefrom).  At the time of the dispositional order in this case, respondent was aware the first service plan was issued before the completion of the integrated assessment and the service plan allegedly did not require a psychological evaluation. If those issues were raised in an appeal from a dispositional order, any error could have been rectified early on in the proceedings.

¶ 41                              2. *Respondent's Past Conduct*

¶ 42          Respondent also contends her parental rights were terminated because she was

still being punished for her past indiscretions because she had completed all of her tasks and did well during child visits. In support of her argument, she notes the ratings in the service plan filed on July 2020 (which evaluated the prior service plan on May 6, 2020) were not based on the evidence and the CASA's best interest report failed to address respondent. The State disagrees and asserts the circuit court's finding was proper. We agree with the State.

¶ 43        The circuit court addressed the pertinent best interest factors and explained why some factors favored termination while other factors were neutral. In doing so, the court commended respondent's progress in recent months. However, the court did not feel the recent progress was enough for the court to return J.C. to respondent at that time. The court felt termination of respondent's parental rights was in J.C.'s best interest, given his age, his special needs, and the length of time he had been in foster care. Our review of the record shows the circuit court considered all of the evidence before it and properly considered the best interest factors in making its judgment. Even if the agency and CASA failed to do their job as alleged by respondent, the court still properly did its job and considered respondent's recent progress in weighing the best interest factors.

¶ 44        Accordingly, we find the circuit court's conclusion it was in J.C.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 45                                B. Case 5

¶ 46        In M.C.'s case, respondent contends the circuit court failed to include any meaningful consideration of M.C.'s right to be a part of the deaf community in allowing cochlear implants for M.C., which were not in her best interest. The State contends we lack jurisdiction of this issue. We agree with the State.

¶ 47        Here, respondent only appealed the circuit court's August 19, 2020, judgment. As

such, this court will disregard any evidence in the record addressing cochlear implants after that date, including the supplement to the record of the transcript for the October 5, 2020, hearing, which this court improvidently allowed.

¶ 48    In the August 2020 judgment, the circuit court made M.C. a ward of the court and appointed DCFS as her guardian.  As to cochlear implants, the court ruled it was not ordering M.C. receive cochlear implants.  It noted DCFS, as M.C.'s guardian, had the authority to consent to the surgery if the surgery was deemed to be in M.C.'s best interest.  See 705 ILCS 405/1-3(8)(a) (West 2018).  The court explained the issue of whether the surgery was in M.C.'s best interest was not yet ripe.  Given the evidence presented with the State's motion, the court felt the time to address the issue was likely when M.C. was eight months old and set a status hearing on the issue of the cochlear implants for October 5, 2020.  At the August 19, 2020, hearing, the court did not make a determination cochlear implants were in M.C.'s best interest.  Thus, the August 19, 2020, judgment was not a final decision on the State's motion for a finding regarding cochlear implants for M.C.  With exceptions that are inapplicable to this case, an appellate court's jurisdiction is limited to reviewing final judgments of the circuit court.  *In re S.B.*, 373 Ill. App. 3d 224, 226, 866 N.E.2d 1286, 1288 (2007).  Thus, we do not have jurisdiction of any judgment on the issue of cochlear implants.

¶ 49                                   III. CONCLUSION

¶ 50    For the reasons stated, we affirm the McLean County circuit court's judgment.

¶ 51    Affirmed.