Docket No. 108575.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

_In re_ J.L. _et al._, Minors (The People of the State of Illinois, Appellant,
v. Stephanie L., Appellee).

_Opinion filed February 19, 2010._

JUSTICE FREEMAN delivered the judgment of the court, with
opinion.
Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman,
Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

Following an evidentiary hearing, the circuit court of Peoria
County found respondent Stephanie L. an unfit parent under section
1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West
2008)). The circuit court subsequently terminated respondent's
parental rights to her three children. A divided appellate court
reversed and remanded. Nos. 3–08–0941, 3–08–0942, 3–08–0943
cons. (unpublished order under Supreme Court Rule 23). For the
reasons set forth below, we reverse the judgment of the appellate
court and affirm the judgment of the circuit court.

BACKGROUND

Respondent is the mother of R.G., a female born on February 19, 2001; T.L., a male born on December 2, 2002; and J.L., a male born on August 25, 2004.

On March 14, 2005, the State filed three separate petitions for wardship, one for each child, alleging that the children had been neglected.[1] In each petition, the State alleged the children were in an injurious environment because of respondent's mental health problems and criminal history. Specifically, the petitions alleged respondent had been diagnosed with bipolar disorder, and "has a criminal history of '00 forgery and on August 27, 2003, [respondent] committed a robbery by luring a man to her residence with the promise of sex." Additionally, the petition for J.L. alleged that he had been neglected as to the care necessary for his well-being, in that he had been diagnosed with nonorganic failure to thrive. On March 15, 2005, the circuit court placed the children in the temporary custody of the Illinois Department of Children and Family Services (DCFS). On December 6, 2005, following an evidentiary hearing, the court found that the children had been neglected.

On January 3, 2006, the circuit court entered a dispositional order finding respondent unfit and making the children wards of the court. Respondent was ordered to undertake the following tasks, among others: (1) cooperate fully and completely with DCFS; (2) submit to a psychological examination arranged by DCFS if requested by her counselor; (3) successfully complete personal counseling, as well as courses in parenting and in domestic violence; (4) obtain and maintain stable housing for her children; and (5) take her psychotropic medications. At the time, respondent was incarcerated, and the circuit court temporarily suspended visitation with her children. DCFS was ordered to supervise all visitation after her release.

On January 11, 2008, the State filed three separate petitions to terminate respondent's parental rights and appoint a guardian with power to consent to the children's adoption. The petitions alleged

---

[1] In addition to respondent, the petitions named the children's father, whose parental rights also were subsequently terminated. However, the order terminating the father's parental rights was not appealed.

that, pursuant to section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2008)), respondent had "failed to make reasonable progress toward the return of the minor[s] to the parent during any 9 month period after the end of the initial 9 month period[ ] following the adjudication of a neglected, abused or dependent minor, being February 1, 2007[,] to November 1, 2007."

A fitness hearing was held on August 13, 2008. Testimony at the hearing indicated respondent was incarcerated in the Illinois Department of Corrections (DOC) for approximately six of the nine months between February 1 and November 1, 2007, the relevant nine-month period.[2] While respondent was in the DOC, she was taking her psychotropic medication. She also completed a four-day anger management class; a prestart program, which involved taking academic courses to prepare her for life outside prison; and eight sessions of parental training. Respondent did not take a domestic violence course. According to the testimony, respondent sent cards and letters to her children "almost monthly."

However, respondent stopped taking her psychotropic medication when she was released from the DOC at the beginning of August 2007. One of her caseworkers, Nicole Friend, testified that at the time respondent was first released, she was able to participate in conversations regarding her children, but as time passed, she appeared to lack retention skills. "[C]onversations appeared to be going no where [*sic*] with her." Friend testified that, to her knowledge, respondent did not receive any kind of treatment or medication from the time she was released from prison until the end of the nine-month period.

J.L., the youngest of respondent's children, was described in the testimony as "medically complex." He has tracheomalacia,[3] which affects his swallowing. He also has tubes in his ears, and he has severe

---

[2] The record indicates respondent was incarcerated in the DOC from September 8, 2006, to August 3, 2007.

[3] "Tracheomalacia" is an "abnormal softening of the wall of the trachea (windpipe), due to a softening of the rings of cartilage (gristle) which normally give the trachea its firmness." 6 J. Schmidt, Attorneys' Dictionary of Medicine T-184 (2007).

clubfeet. J.L. needs occupational and physical therapy, as well as assistance with eating.

According to the testimony at the fitness hearing, respondent's visits with her children after she was released from prison did not go well. One of these visits took place on August 17, 2007, at a McDonald's restaurant. There was a cake, and respondent brought "a larger kitchen knife that was not just a butter knife" to cut the cake. Respondent then left the knife on the table with the point outward, apparently unaware of the danger this posed with her children running around the table. The supervising caseworker, Nicole Friend, eventually moved the knife to a safer location and spoke to respondent about it later. While the children were playing on the McDonald's playground, Friend advised respondent not to play too roughly with J.L. and not to let him climb stairs. Friend was concerned because J.L. was "very clumsy" and unsteady, partly because of his clubfoot condition. According to Friend, respondent did not acknowledge these concerns and instead let J.L. climb the stairs.

A second visit, also supervised by Friend, took place on September 20, 2007. At one point during the visit, Friend noticed the children "were all running around wildly almost." When J.L. began to have difficulty breathing as a result of his medical conditions, his foster mother, who was present during the visit, asked respondent to settle him down and try to get him to stop running. According to Friend, respondent answered: "We're just playing." Friend then intervened and told respondent to settle J.L. down or Friend would end the visit. Respondent put her hands on her hips and said, "Fine. We're just playing."

A third visit took place on October 10, 2007, at the home of J.L.'s foster parents. At the start of the visit, J.L. and T.L. were in the house and R.G. was on her way home from school. Friend testified that respondent attempted to play with J.L. by tickling him and asking him to sit on her lap, but J.L. ignored her and "kept covering his ears and hiding his face." Respondent then turned her attention to T.L. and asked him to sit on her lap. T.L. declined and came over to Friend and asked if he could go outside. Shortly thereafter, R.G. came home from school. According to Friend, R.G. had "a really good day at school and had gotten four smiley faces and was trying to tell us all about it." However, respondent did not acknowledge what R.G. was saying and

instead urged R.G. to come and play with her and talk to her. Friend stated that respondent "attempted to pull [R.G.] towards her[,] not acknowledging what [R.G.] was telling us about her day."

At the conclusion of the fitness hearing, the circuit court found the State had proved by clear and convincing evidence that respondent failed to make reasonable progress toward the return of her children from foster care. The court commended respondent for taking parenting classes, completing an anger management course, participating in "some type of job counseling," and maintaining contact with her children while she was in prison. However, the court expressed concern that respondent had serious mental health problems, yet she stopped taking her medication after she was released from prison. According to the court, respondent's visits with her children did not go well "because she stopped taking her medication."

On October 27 and 28, 2008, the circuit court conducted a best-interests hearing. At the conclusion of the hearing, the court found it was in the children's best interests to terminate respondent's parental rights. The court entered best-interests orders dated October 28, 2008, terminating respondent's parental rights as to each child and naming the guardianship administrator of DCFS as guardian with the power to consent to adoption.

Respondent appealed, and a divided appellate court reversed and remanded. The majority concluded that because respondent was incarcerated for six months of the relevant nine-month period, she "was effectively given three months out of nine to demonstrate reasonable progress regarding most of her tasks." Nos. 3–08–0941, 3–08–0942, 3–08–0943 cons. (unpublished order under Supreme Court Rule 23). According to the majority, "respondent was not given an adequate opportunity to demonstrate whether she could make progress," and a remand for additional evidence was necessary. Nos. 3–08–0941, 3–08–0942, 3–08–0943 cons. (unpublished order under Supreme Court Rule 23).

The dissenting justice stated respondent was given the statutory nine months provided by the legislature in section 1(D)(m)(iii) and a remand therefore was inappropriate. The dissent emphasized that the majority did not conclude respondent made reasonable progress toward the return of her children, but rather "only that she should be

given more time." Nos. 3–08–0941, 3–08–0942, 3–08–0943 cons. (unpublished order under Supreme Court Rule 23) (Schmidt, J., dissenting). The dissent stated: "There is simply no legal authority for the manner in which the majority has reversed." Nos. 3–08–0941, 3–08–0942, 3–08–0943 cons. (unpublished order under Supreme Court Rule 23) (Schmidt, J., dissenting).

We allowed the State's petition for leave to appeal. 210 Ill. 2d R. 315. In addition, we allowed the Cook County public guardian to file an *amicus curiae* brief in support of the children, and we allowed the Cook County State's Attorney to file an *amicus curiae* brief in support of the State. 210 Ill. 2d R. 345.

## ANALYSIS

In Illinois, the authority to terminate parental rights involuntarily is found in the Juvenile Court Act of 1987 (705 ILCS 405/1–1 *et seq.* (West 2008)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2008)). *In re E.B.*, 231 Ill. 2d 459, 463 (2008). A petition to terminate parental rights is filed pursuant to section 2–29 of the Juvenile Court Act. That section delineates a two-step process in seeking termination of parental rights involuntarily. 705 ILCS 405/2–29(2) (West 2008). First, the court must find, by "clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act." 705 ILCS 405/2–29(2), (4) (West 2008); 750 ILCS 50/1(D) (West 2008); *In re E.B.*, 231 Ill. 2d at 472; *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Second, once a finding of parental unfitness is made under section 1(D) of the Adoption Act, the court considers the "best interest" of the child in determining whether parental rights should be terminated. 705 ILCS 405/2–29(2) (West 2008). Section 1–3 of the Juvenile Court Act lists the relevant "best interest" factors to be considered. 705 ILCS 405/1–3(4.05) (West 2008).

In the case at bar the State alleged, in its petitions to terminate parental rights, that respondent was unfit pursuant to section 1(D)(m)(iii) of the Adoption Act. Section 1(D)(m)(iii) provides, in pertinent part:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the

likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:

* * *

(m) Failure by a parent *** (iii) to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(iii) (West 2008).[4]

Here, respondent's children were adjudicated neglected on December 6, 2005, and the initial nine-month period following the neglect adjudication therefore ended on September 6, 2006. The State designated February 1, 2007, to November 1, 2007 as the relevant nine-month period after September 6, 2006, the end of the initial nine-month period.

The appellate court concluded that because respondent was incarcerated for six of the nine months between February 1 and November 1, 2007, she was effectively given only three months to demonstrate reasonable progress toward the return of her children. The appellate court held this was an inadequate amount of time. The State argues that, in reaching this conclusion, the appellate court misconstrued section 1(D)(m)(iii). According to the State, the

---

[4] Subsection (iii) of section 1(D)(m), containing the reference to any nine-month period after the end of the initial nine-month period following the adjudication of neglect, was added in 2000. Pub. Act 91–373, §5, eff. January 1, 2000. Prior to that point, section 1(D)(m) or its predecessor provision referred only to the initial period after the neglect adjudication as the period during which reasonable progress toward the return of the child was to be made. In adding subsection (iii), with its reference to any nine-month period *after* the initial nine-month period, the legislature

"wanted to protect the parent who failed to make progress during the initial nine-month period following the adjudication of neglect, but made reasonable progress during any subsequent nine-month period. At the same time, the legislature wanted to protect the child whose parent made progress during the initial nine-month period but reverted to negative behavior in any subsequent nine-month period." *In re D.F.*, 208 Ill. 2d 223, 248 (2003) (Freeman, J., concurring, joined by McMorrow, C.J.).

appellate court has, in effect, rewritten that section "to provide that time in prison tolls the nine-month period during which reasonable progress must be made."

Our primary objective in construing a statute is to give effect to the intention of the legislature. *In re C.W.*, 199 Ill. 2d 198, 211 (2002). The most reliable indicator of the legislature's intent is the language of the statute, which must be given its plain and ordinary meaning. *In re D.F.*, 208 Ill. 2d 223, 229 (2003). In addition, a statute should be read as a whole, considering all relevant parts. *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 361 (2009), quoting *Harshman v. DePhillips*, 218 Ill. 2d 482, 493 (2006). Where the statutory language is clear and unambiguous, it will be given effect as written, without resort to other aids of construction. *In re C.W.*, 199 Ill. 2d at 211-12; *In re D.F.*, 208 Ill. 2d at 229. We may not depart from a statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express. *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 184-85 (2009); *In re C.W.*, 199 Ill. 2d at 211-12. The interpretation of a statute is a question of law, and our review is *de novo*. *In re D.D.*, 196 Ill. 2d 405, 418 (2001); *In re D.F.*, 208 Ill. 2d at 229.

We conclude the language of section 1(D)(m)(iii) is clear and unambiguous with regard to the question at issue. There is no exception for time spent in prison. Indeed, no mention is made of incarceration. The statute simply provides that a ground for a finding of unfitness is the "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor *** or dependent minor." 750 ILCS 50/1(D)(m)(iii) (West 2008). Where the language is clear and unambiguous, courts may not read into it exceptions that the legislature did not express. *In re D.D.*, 196 Ill. 2d at 419; *In re C.W.*, 199 Ill. 2d at 211-12.

We note, in addition, that the legislature was well aware of the possibility that a parent subject to termination proceedings would be incarcerated. For example, under section 1(D)(r) of the Adoption Act, a parent is unfit if, *inter alia*, she "is incarcerated as a result of criminal conviction at the time the petition or motion for termination of parental rights is filed *** and the parent's incarceration will

prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." 750 ILCS 50/1(D)(r) (West 2008). Similarly, under section 1(D)(s), a parent is unfit if "the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2008).

However, the legislature included no exception for incarcerated parents in section 1(D)(m)(iii). It is thus inappropriate to infer the legislature intended such an exception. See *Adames v. Sheahan*, 233 Ill. 2d 276, 311 (2009) ("When Congress includes particular language in one section of a statute but omits it in another section of the same act, courts presume that Congress has acted intentionally and purposely in the inclusion or exclusion"); 2A N. Singer & J. Singer, Sutherland on Statutory Construction §46:5, at 228-29 (7th ed. 2007) ("where the legislature has employed a term in one place and excluded it in another, it should not be implied where excluded").

Moreover, in determining whether a parent has made reasonable progress toward the return of the child, courts are to consider evidence occurring only during the relevant nine-month period mandated in section 1(D)(m). See *In re D.L.*, 191 Ill. 2d 1, 10 (2000); *In re C.N.*, 196 Ill. 2d 181, 218 (2001). In the case at bar, after holding that respondent was given inadequate time to demonstrate reasonable progress, the appellate court remanded for additional evidence of reasonable progress occurring after the relevant nine-month period. This was impermissible.

Our holding here that time spent in prison does not toll the nine-month period is consistent with a number of decisions by our appellate court. In *In re E.J.F.*, 161 Ill. App. 3d 325 (1987), the respondent mother argued that time incarcerated should be excluded from the relevant period. The court expressly rejected this argument, stating the period mandated in section 1(D)(m) of the Adoption Act "must include the period of respondent's incarceration." *In re E.J.F.*, 161 Ill. App. 3d at 330. In *In re J.R.Y.*, 157 Ill. App. 3d 396 (1987), and *In re D.D.*, 309 Ill. App. 3d 581 (2000), the respondents do not appear to

have argued specifically that time spent in prison should have been excluded. In each case the court held that the respondent failed to make reasonable progress toward the return of the child, notwithstanding the respondent's incarceration during the relevant period.

The appellate court in the case at bar did not address any of these cases. The main authority relied upon by the appellate court was *In re D.S.*, 313 Ill. App. 3d 1020 (2000). In that case, the circuit court found the respondent mother unfit on the ground, *inter alia*, that she failed to make reasonable progress toward the return of her child within nine months after the adjudication of neglect. The circuit court terminated the respondent's parental rights, and the appellate court affirmed. Much of the appellate court's analysis was devoted to determining the proper beginning date for the nine-month period.[5] The appellate court then turned to whether the circuit court's unfitness finding was against the manifest weight of the evidence. In upholding that finding, the appellate court explicitly refused to consider evidence occurring after the end of the period. *In re D.S.*, 313 Ill. App. 3d at 1029.

In the case at bar, the appellate court's reliance on *In re D.S.* is misplaced. First, unlike here, there is no indication in *In re D.S.* that the respondent was incarcerated. Indeed, *In re D.S.* makes no mention of incarceration. Moreover, the appellate court in *In re D.S.* explicitly refused to consider evidence occurring after the end of the nine-month period. This runs directly counter to the appellate court's conclusion here that the instant case must be remanded for additional time for respondent to demonstrate reasonable progress.

*In re D.S.* simply does not stand for the proposition that time incarcerated is excluded from the nine-month period under section

---

[5] *In re D.S.* held that the nine-month period began on the date the circuit court entered a dispositional order adjudicating the child neglected, rather than the (earlier) date the circuit court found the child neglected. *In re D.S.*, 313 Ill. App. 3d at 1028. In *In re D.F.*, 208 Ill. 2d 223, 239-42 (2003), we rejected this conclusion, holding that the nine-month period began on the date the circuit court found the child neglected, rather than the date the court entered its dispositional order.

1(D)(m). We agree with the dissenting justice below that *In re D.S.* does not support the majority's decision.

In sum, there is no legal basis for the appellate court's conclusion that time spent in prison tolls the nine-month period during which reasonable progress must be made. This conclusion is in contravention of the plain language of section 1(D)(m)(iii), which includes no exception for incarcerated parents. It is also contrary to a number of appellate court decisions.

In addition, the appellate court's conclusion leaves the circuit court with an unworkable framework under which to proceed. The appellate court remanded to afford respondent additional time to demonstrate reasonable progress, but failed to instruct the circuit court as to how much additional time should be allowed. Under the appellate court's remand, it is not clear whether the circuit court should consider evidence of reasonable progress six months past November 1, 2007, to account for the portion of the nine-month period respondent was in prison, or whether some other quantity of time should apply.

We hold, contrary to the appellate panel below, that time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m)(iii). The statute contains no exception for incarcerated parents. Our decision today upholds the law as it stands. Whether this needs to be changed is a policy question more appropriately directed to the legislature.

We note, in addition, that because the appellate court held in favor of respondent on the statutory issue of whether time spent in prison counted toward the nine-month period under section 1(D)(m)(iii), the court did not reach the issue of whether the circuit court's findings regarding respondent's fitness and the best interests of her children were against the manifest weight of the evidence. Normally, we would remand the cause to the appellate court to decide this issue. However, the parties have fully briefed the issue, and the record is before us. Moreover, this case has been ongoing for nearly five years. The record indicates respondent's children, including J.L., who is described as "medically fragile," have been in foster care since March 2005. In these circumstances, it is appropriate that we exercise our supervisory authority and decide this issue in the interest of judicial economy. See

-11-

*Geary v. Dominick's Finer Foods, Inc.*, 129 Ill. 2d 389, 408 (1989); *Krasnow v. Bender*, 78 Ill. 2d 42, 47 (1979).

After carefully reviewing the record, we conclude that the circuit court's finding of unfitness was not against the manifest weight of the evidence. We reach the same conclusion regarding the circuit court's finding that it was in the children's best interests to terminate respondent's parental rights. In support of this finding, the court noted respondent "has a long history of mental health problems, a long history of not taking her psychotropic medication," and concluded respondent "doesn't have the ability to adequately care for these children and to keep them physically and mentally safe." Emphasizing that the children had been with their respective foster parents for several years, the court stated it was clear, "based on the facts, that these children are much more bonded with their foster parents than they are with their natural mother and father." The court added that the foster parents "have indicated their desire to adopt these children." The dissenting justice in the appellate court also noted the foster parents' desire to adopt the children, and stated: "It is time to allow these children to move on with their lives." Nos. 3–08–0941, 3–08–0942, 3–08–0943 cons. (unpublished order under Supreme Court Rule 23) (Schmidt, J., dissenting). We agree, and affirm the circuit court's findings regarding respondent's fitness and the best interests of her children.

CONCLUSION

The judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

-12-