NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210025-U

NO. 4-21-0025

IN THE APPELLATE COURT

FILED
May 27, 2021
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* L.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 19JA35 |
| v. | ) | |
| Alexis Y., | ) | Honorable |
| Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, finding the trial court's best-interest determination
was not against the manifest weight of the evidence.

¶ 2   Respondent, Alexis Y., appeals from the trial court's December 16, 2020, order

terminating her parental rights to her minor child, L.P. (born April 23, 2019), arguing the court

erred in finding termination to be in L.P.'s best interest. We affirm.

¶ 3   I. BACKGROUND

¶ 4   On April 26, 2019, the State filed a petition for adjudication of wardship of L.P.

due to multiple police reports of domestic violence committed during respondent's pregnancy by

L.P.'s father, Fernando P. The State alleged, in relevant part, L.P. was neglected pursuant to

section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-

3(1)(b) (West 2018)) because respondent's unresolved issues relating to domestic violence created an environment injurious to L.P.'s welfare. Respondent admitted the allegation, and the trial court entered an adjudicatory order finding L.P. was neglected. On August 27, 2019, the court entered a dispositional order finding respondent unfit to care for L.P., making L.P. a ward of the court, and placing custody and guardianship of the minor with the Department of Children and Family Services.

¶ 5        On September 30, 2020, the State filed an amended petition to terminate respondent's parental rights. The State alleged, in relevant part, respondent was an unfit person within the meaning of section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) because she failed to make reasonable progress toward L.P.'s return during any nine-month period—specifically, December 19, 2019, through September 19, 2020—following the adjudication of neglect. Respondent admitted the allegation, and a best-interest hearing was scheduled.

¶ 6        On December 16, 2020, the trial court conducted a best-interest hearing. The court took judicial notice of the entire case record, including two best-interest reports, and heard the testimony of Paula Coleman, Taylor McDonald, and respondent.

¶ 7        The best-interest reports indicated L.P. was placed with Paula Coleman, L.P.'s foster mother and maternal grandmother, on April 25, 2019, two days after her birth. According to the reports, L.P. was "thriving in her foster home placement" because it "provided her with a safe environment and unconditional love" that allowed her "to feel safe, secure[,] and happy." The placement also allowed L.P. to live with her three older brothers. Due to respondent's "ongoing domestic violence" issues—which included Fernando P. "repeatedly punching [her] in the nose" for declining his attempts "to initiate sexual contact" on September 18, 2020—the

reports recommended her parental rights to L.P. be terminated and the permanency goal changed from "return home" to adoption by Coleman.

¶ 8 Paula Coleman testified L.P. was placed in her care two days after L.P.'s birth and has remained in her care for the duration of the case. Coleman testified she is also the guardian of L.P.'s three older brothers and all four siblings live with her. According to Coleman, L.P. "really loves her three older brothers. They're very close." Coleman testified she and L.P. have a strong bond and she wishes to adopt L.P. if L.P. cannot be returned to respondent's care.

¶ 9 Taylor McDonald testified she is a caseworker with The Baby Fold and was assigned to L.P.'s case. McDonald testified respondent consistently attended her visits with L.P. and the visits were "positive." McDonald also stated respondent's domestic violence counselor informed her that respondent "was going to be discharged soon[,]" although McDonald did not know the exact date of the expected discharge. However, on cross-examination, McDonald testified that "even though [respondent] is close to completing her domestic violence treatment, I don't know that we can say that she's implemented the skills that she has learned in the course because of her *** continued police reports for domestic violence throughout the case." McDonald noted it was "very hard to say" respondent and Fernando P. were not together because "historically they have been dishonest about their contact and relationship." She further testified that, even if respondent's parental rights were preserved, it could take a year or longer to return L.P. to respondent's care.

¶ 10 Respondent testified her final domestic violence class was scheduled for later that day. She indicated she planned to continue meeting with her domestic violence counselor once she completed the class to "continue to learn and just stay on the right track." Respondent further testified she no longer had a relationship with Fernando P. and had no intentions of continuing a

relationship with him in the future. On cross-examination, respondent acknowledged L.P. was removed from her care due to domestic violence during her pregnancy, and she acknowledged that Fernando P. hit her on September 18, 2020, while she was twenty weeks pregnant with her fifth child. Respondent also admitted she previously lied on multiple occasions about her relationship with Fernando P.

¶ 11 Following presentation of the evidence, the trial court determined it was in L.P.'s best interest to terminate respondent's parental rights and entered an order terminating parental rights.

¶ 12 This appeal followed.

¶ 13 II. ANALYSIS

¶ 14 Respondent argues the trial court erred in determining termination of her parental rights was in L.P.'s best interest. We will not reverse a best-interest determination absent a finding it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009).

¶ 15 Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2018)) "delineates a two-step process in seeking termination of parental rights involuntarily." *In re J.L.*, 236 Ill. 2d 329, 337, 924 N.E.2d 961, 966 (2010). Relevant to the instant appeal is the second step—*i.e.*, the best-interest stage—at which the trial court must determine whether the State has proven by a preponderance of the evidence that termination of the respondent's parental rights is in the minor's best interest. 705 ILCS 405/2-29(2) (West 2018). At the best-interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *In re D.T.*, 212 Ill. 2d 347, 364, 818

- 4 -

N.E.2d 1214, 1227 (2004). Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 16 Section 1-3 of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)) lists the best-interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best-interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child.

¶ 17 Here, the facts do not demonstrate termination of respondent's parental rights was not in L.P.'s best interest. Paula Coleman, L.P.'s foster mother and maternal grandmother, testified L.P. was placed in her care on April 25, 2019, two days after her birth, and has remained in her care for the duration of the case. Coleman is also the guardian of L.P.'s three older brothers, and all four siblings live in the same home. According to Coleman, L.P. "really loves her three older brothers. They're very close." The best-interest reports indicated L.P. was "thriving in her foster home placement" because the placement "provided her with a safe environment and unconditional love"; further, "a very strong attachment" between L.P. and Coleman was "very evident throughout their interactions." Coleman also testified she would be willing to adopt L.P. and would allow her to maintain a relationship with respondent.

¶ 18 On the other hand, while respondent's visits with L.P. reportedly went well and she had recently been making progress in her domestic violence classes, there remained concerns about her relationship with Fernando P. and the potential threat it posed to L.P.'s safety. As

recently as September 18, 2020, respondent—who was twenty weeks pregnant with her fifth child at the time—was "repeatedly punch[ed] *** in the nose" by Fernando P. for declining his attempts "to initiate sexual contact." Although respondent testified she no longer had contact with Fernando P., she also admitted she had lied about her relationship with him in the past. Moreover, McDonald, the caseworker assigned to L.P.'s case, indicated that even if respondent's parental rights were preserved, it could still take a year or longer to return L.P. to her care.

¶ 19 Based on these facts, and considering L.P.'s need for permanence and a safe and loving environment, we cannot say the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 20 III. CONCLUSION

¶ 21 For the reasons stated, we affirm the trial court's judgment.

¶ 22 Affirmed.