2026 IL App (4th) 251192-U

NOS. 4-25-1192, 4-25-1193, 4-25-1194, 4-25-1195, 4-25-1196 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FILED
March 26, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re V.J., L.J., E.J., A.J., and S.J., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Livingston County |
|       Petitioner-Appellee, | ) | Nos. 22JA12 |
|       v. | ) | 22JA13 |
| Vincent J., | ) | 22JA14 |
|       Respondent-Appellant). | ) | 22JA15 |
| | ) | 22JA17 |
| | ) | |
| | ) | Honorable |
| | ) | Mary E. Koll, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's judgment terminating respondent's parental rights, as (1) the court's finding that respondent was unfit for failing to make reasonable progress was not against the manifest weight of the evidence and (2) due to the absence of a complete record, we presumed the best-interests finding was in conformity with the law and had a sufficient factual basis.

¶ 2    Respondent, Vincent J., appeals from the trial court's judgment terminating his parental rights as to his five minor children, V.J. (born in 2009), L.J. (born in 2009), S.J. (born in 2013), E.J. (born in 2014), and A.J. (born in 2015). On appeal, respondent argues that the court erred in finding that (1) he was unfit for failing to make reasonable efforts and progress and (2) it was in the best interests of the minors to terminate his parental rights. The minors' mother is not a party to this appeal. For the following reasons, we affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4            On April 15, 2022, the State filed a petition for adjudication of wardship as to respondent's children, alleging that their environment was injurious to their welfare under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)) where (1) respondent had substance abuse issues that prevented him from properly parenting, (2) respondent drove with them in the car while under the influence of alcohol or other illegal substances, and (3) the children's mother had mental health issues that prevented her from properly parenting. On January 24, 2023, the trial court found that the State proved the second allegation of the petition for adjudication and that the minors were neglected. On February 14, 2023, the court entered a dispositional order making the minors wards of the court and placing guardianship with the Illinois Department of Children and Family Services (DCFS), but it found both the children's mother and respondent to be fit and placed custody of the children with the parents. The court entered a permanency order on May 2, 2023, finding the parents continued to be fit.

¶ 5            On June 9, 2023, the State filed a motion to modify the dispositional order to find the parents unfit on the bases that (1) the mother was arrested for driving under the influence of alcohol on April 29, 2023, (2) respondent was visibly intoxicated and had positive Breathalyzer screens with a blood alcohol content of 0.220 and 0.235 when he appeared for a court proceeding on May 3, 2023, (3) a DCFS investigator reported that respondent relapsed on alcohol immediately after having his ankle monitor removed on January 19, 2023, (4) the children disclosed that respondent came home intoxicated and had physically fought with their mother, and (5) the parents had not been completing the services required under the service plan. On June 13, 2023, the trial court entered a modified dispositional order, finding both parents unfit and placing custody of the children with DCFS. The court entered permanency orders on October 3, 2023, December 12,

2023, March 11, 2024, July 15, 2024, and November 19, 2024, finding that respondent continued to be unfit.

¶ 6    On February 14, 2025, the State filed petitions to terminate respondent's parental rights with respect to all five children, alleging that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)), (2) failed to make reasonable efforts to correct the conditions that caused the minors to be removed during any of the three nine-month periods following the adjudication of their neglect (750 ILCS 50/1(D)(m)(i) (West 2024)), and (3) failed to make reasonable progress toward the return of the minors during any of the nine-month periods alleged (750 ILCS 50/1(D)(m)(ii) (West 2024)). The three nine-month periods alleged were (1) January 24, 2023, to October 24, 2023; (2) October 24, 2023, to July 24, 2024; and (3) May 13, 2024, to February 13, 2025. The trial court entered another permanency order on May 6, 2025, finding that respondent continued to be unfit.

¶ 7    The trial court held a hearing on the State's petition to terminate respondent's parental rights on August 26, 2025, and November 4, 2025. The following evidence was presented.

¶ 8    Taylor McDonald testified that she had been a supervisor at The Baby Fold (a child welfare agency) for two years and had previously been both a caseworker and adoption worker at the organization. She was the caseworker assigned to respondent's children's case for around six months, beginning in October 2023, and she then continued to supervise the case until the present. She testified that under the service plan, respondent was to complete mental health treatment, a domestic violence assessment, substance use treatment, and drug screening, as well as maintain stable housing and employment and cooperate with The Baby Fold. McDonald testified that respondent was incarcerated for the six months that she was the caseworker. She stated that respondent did not complete any of his services during that time but had daily phone contact with

- 3 -

his children.

¶ 9            McDonald testified that even if someone completed the programs available at the jail, DCFS would still require them to do an assessment once they were released and allow the service provider to determine whether they needed additional services. Especially regarding substance abuse treatment completed during incarceration, DCFS "would still need to closely monitor once they were released *** to make sure that they follow through with what they learned."

¶ 10          Emmalee DeMarb testified that she was the caseworker at The Baby Fold assigned to respondent's children's cases between February and August 2024. Respondent was incarcerated during this time. Respondent had monthly video visits with the children while incarcerated. DeMarb could not recall if respondent was waiting to participate in a substance abuse program and parenting classes or actually participating in them while she was the caseworker.

¶ 11          Emalie Chavira testified that she was the caseworker at The Baby Fold assigned to respondent's children's cases since September 2024. Respondent was incarcerated during this time. He told her that he completed several services while incarcerated, but Chavira did not receive any proof of that, despite asking respondent to provide her with it. She did not reach out to respondent's counselor because she did not have any information about who was providing those services. She reiterated that even if respondent had completed programs while in prison, "[t]here would have to be additional assessments done once he is released," and she noted, "It's also difficult because we have no way of assessing whether or not he's retained the information necessary for his services to be considered complete." Respondent spoke to the children frequently over the phone but declined in-person visitation because "he didn't feel that [the prison] was an appropriate visit place for the children."

¶ 12　　　　At the State's request and with no objection, the trial court admitted six exhibits, consisting of the service plans for respondent's family from the time that the case opened until the time of the hearing. These service plans showed the following. As of March 1, 2023, respondent was referred to parenting classes and provided a tablet to access the virtual sessions, but he did not attend the scheduled sessions. He was not employed at the time. The family, with two adults and six children, resided in a trailer. Respondent and the children's mother were divorced but continued to reside together. As of June 9, 2023, the caseworker noted that respondent "relapsed on alcohol," and although neither parent confirmed it, there were concerns of domestic violence in the home based on the children's reports. The caseworker further noted an incident on June 9, 2023, where respondent picked up the children from school while intoxicated, and another incident where he "arriv[ed] to court on the wrong day under the influence with one of the children." The children no longer resided in the home; A.J. and S.J. resided together with their aunt and uncle, while L.J., E.J., and V.J. resided together in another relative placement.

¶ 13　　　　McDonald indicated in the service plan that as of November 20, 2023, she had not yet had contact with respondent since being assigned the case in October 2023, as he was in jail for manufacturing and delivery of cocaine. McDonald noted that respondent had not signed paperwork with prior caseworkers and had not engaged in services consistently. She also reported that the trailer where he lived with the children's mother prior to his incarceration was infested with cockroaches. Respondent had not engaged in parent-child visits consistently prior to his incarceration and had not completed a parenting class. McDonald also stated that respondent was discharged from mental health and substance abuse treatment in September 2023 due to his incarceration. His treatment providers reported that he "was making minimal progress in services and provided two drug screens positive for alcohol" but "denied any substance use during

treatment." He had not completed a domestic violence assessment.

¶ 14    A service plan prepared on June 11, 2024, by DeMarb reported that respondent had regular phone contact with his children while he was incarcerated but had still not completed a parenting class, mental health or substance abuse treatment, or domestic violence assessment. She noted that respondent was serving a nine-year prison sentence for manufacturing and delivery of cocaine.

¶ 15    As of December 3, 2024, Chavira reported that respondent had been recently transferred to Jacksonville Correctional Center and begun orientation for services through the prison, including parenting, substance abuse, and domestic violence/anger management services. In a service plan dated May 28, 2025, Chavira indicated that respondent had completed substance abuse treatment and money management courses and would begin a work release program.

¶ 16    At the State's request, the trial court took judicial notice of the adjudicatory order, dispositional order, and modified dispositional order. At respondent's request and without objection, the court admitted an exhibit consisting of seven certificates for services that respondent completed while in prison. These certificates showed that respondent completed an anger management class on July 19, 2025, a "Parenting While Incarcerated" class on July 18, 2025, a "GED Checklist" class on July 13, 2025, a class regarding "Changing habits around drug and alcohol use" on July 21, 2025, a money management class on May 9, 2025, and a forklift safety certification class on August 12, 2025. He also received a certificate of attendance for attending at least four Alcoholics Anonymous classes in December 2024.

¶ 17    The trial court ultimately found that the State proved by clear and convincing evidence that respondent failed to make reasonable efforts or reasonable progress. The court explained,

"It does sound like you have made some efforts to better yourself while you've been in the facility; but as far as my understanding from the evidence, you did not affirmatively provide substantial information to the caseworker concerning the treatment that you received while incarcerated, doesn't sound like you provided her with contact information for specific treatment providers to try to follow up with, and there is evidence from the testimony *** that these services would not meet the requirements of the service plan and you did not do anything to demonstrate otherwise. And you at no point during the life of this case have been close to reunification based on your lack of progress on the service plan and your incarceration."

However, the court found that the State did not prove that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for his children.

¶ 18        The trial court moved on to the best-interests portion of the hearing. The court noted that it received and reviewed a best-interests report, which it admitted into evidence. That report does not appear in the record on appeal. At the State's request, the court took judicial notice of the evidence presented at the fitness hearing. Respondent briefly testified that he was currently in a fatherhood class and was employed while he was incarcerated. He noted that while his projected parole date was June 2027, he predicted it would really be in March or June 2026 due to good-time credit. He testified that he stayed in contact with his children by phone, and they were always smiling and happy when he talked with them. He believed he could be a father to these children when he was released from prison and that it would be in their best interests for that to happen.

¶ 19        The trial court ultimately found that it would be in the children's best interests to terminate respondent's parental rights. The court explained that "whether or not I specifically

reference any particular factor, I have reviewed and considered throughout the presentation of evidence today and the arguments, all of the best-interest factors and I am appropriately weighing all of them, again, whether or not I specifically reference them or not." The court acknowledged that respondent's "situation is unique in the sense that [he is] where [he is] based on [his] own choices" and is "not able to have the level of agency that a person who's out in the community is able to have." However, the court emphasized that "we could not allow these children to continue to remain in an instable [*sic*] situation." The court noted that according to the best-interests report, the children had already moved placements, and "there have been many negatives that have occurred in connection with these children based on the years' worth of instability here." The court also recognized that the report reflected they were all doing well due to their recent stability. The court stressed that the children need permanence. The court noted that terminating respondent's parental rights did not mean he could not have a relationship with his children and encouraged him to continue to engage in appropriate communication with them in line with their foster parents' wishes. The court found that respondent was unable to provide for the children's physical or financial needs in any way due to his incarceration. The court reiterated that "[t]he longer that [the children] remain in limbo there is always a possibility in continued disruption in their foster placement, and that would be very detrimental to them at this point in time."

¶ 20 This appeal followed.

¶ 21         II. ANALYSIS

¶ 22 Respondent argues on appeal that the trial court erred in finding that (1) he was unfit for failing to make reasonable efforts and progress and (2) it was in the best interests of the minors to terminate his parental rights.

¶ 23                              A. Unfitness

¶ 24       The involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Act (705 ILCS 405/2-29(2) (West 2024)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999).

¶ 25       We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. Under this standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We "must not substitute [our] judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 499.

¶ 26       The trial court found that respondent was unfit based on his failure to (1) make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2024)) and (2) make reasonable progress toward the return of the children during those nine-month periods (750 ILCS 50/1(D)(m)(ii) (West 2024)). The three nine-month periods alleged in this case were (1) January 24, 2023, to October 24, 2023; (2) October 24, 2023, to July 24, 2024; and (3) May 13, 2024, to February 13, 2025. Importantly, "[a] parent's rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence." *In re D.C.*, 209 Ill. 2d 287, 296 (2004). Thus, we need only address whether the court correctly found that

respondent failed to make reasonable progress toward the return of the children during the relevant nine-month periods. We conclude that it did.

¶ 27 Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent fails to make reasonable progress toward the return of the child when the parent fails " 'to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m)(ii) (West Supp. 1999)). Importantly, there is "a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent and actually changing the circumstances that brought the children into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. A finding of unfitness is appropriate if "the court will not be able to return the child[ren] home in the near future, despite ample time and opportunity for compliance with the court's directives." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 28 Though respondent argues that the trial court "failed to fully consider what could reasonably be expected" from him while he was incarcerated, he fails to acknowledge that unlike reasonable efforts, reasonable progress is evaluated under "an objective standard that is not concerned with a parent's individual efforts and abilities." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. It is true that "incarceration can impede progress toward the goal of reunification." *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. However, section 1(D)(m)(ii) of the Adoption Act contains "no exception for time spent in prison," and "[i]ndeed, no mention is made of incarceration" in the statute. *In re J.L.*, 236 Ill. 2d 329, 340 (2010). Thus, "time spent incarcerated

is included in the nine-month period during which reasonable progress must be made" under section 1(D)(m)(ii). *J.L.*, 236 Ill. 2d at 343.

¶ 29    The first nine-month period ran from January 24, 2023, to October 24, 2023. Respondent was not incarcerated during most of this time. The trial court found at the dispositional hearing in February 2023 that respondent was fit; however, the court modified the dispositional order and found respondent unfit in June 2023. The service plans dated March 1, 2023, June 9, 2023, and November 20, 2023, indicated that during this period, respondent "relapsed on alcohol," there were concerns of domestic violence in the home based on the children's reports, there was an incident on May 3, 2023, where he "arriv[ed] to court on the wrong day under the influence with one of the children," and there was another incident on June 9, 2023, where respondent picked up the children from school while intoxicated. He was not employed at this time. Though the record does not reflect exactly when respondent began his incarceration—only that he was incarcerated for manufacturing and delivery of cocaine some time before October 2023—the Illinois Department of Corrections' website indicates his custody date was August 28, 2023. See *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12 n.3 ("This court may take judicial notice of Department of Corrections records because they are public documents."). At that point, respondent had not signed any releases of information or completed any recommended services. Despite being provided with a tablet to facilitate his attendance at parenting classes, he reportedly did not attend. Respondent was discharged from mental health and substance abuse treatment in September 2023 due to his incarceration, and his providers reported that he "was making minimal progress in services and provided two drug screens positive for alcohol" but "denied any substance use during treatment." The evidence thus reflects that at the end of this first nine-month period, respondent was no closer to the return of his children to his custody than he was when the case

first began; in fact, he was further away from that goal, as the children were removed from his custody during this period due to issues with alcohol abuse and potential domestic violence, and he was later incarcerated on drug charges.

¶ 30 The second nine-month period ran from October 24, 2023, to July 24, 2024. Respondent continued to be incarcerated during this time. According to the testimony presented at the fitness hearing and the service plans dated November 20, 2023, and June 11, 2024, respondent did not complete any of his recommended services during this period. He did have frequent phone contact with his children. However, he did not demonstrate any reasonable progress toward reunification with his children.

¶ 31 The last nine-month period in this case ran from May 13, 2024, to February 13, 2025. Respondent remained incarcerated during this period. The evidence presented at the hearing reflects that although respondent told Chavira that he completed several services while incarcerated, he failed to provide proof to her when asked. Chavira also explained that even if respondent had completed services, he would still have to complete assessments once released from prison to determine if the services he completed satisfied the service plan and if he needed to complete any supplementary services. In the service plan dated December 3, 2024, Chavira reported that respondent had begun orientation for services offered by his prison. In the next service plan, dated May 28, 2025, three months after the end of the last nine-month period, Chavira indicated that respondent completed substance abuse treatment and money management courses and would begin a work release program, though we do not know from the record when exactly that occurred. Respondent offered additional evidence at the hearing, which he did not provide to his caseworkers at the time, that he received a certificate of attendance for attending at least four Alcoholics Anonymous classes in December 2024; however, the record does not reflect whether

this was part of a substance abuse program and whether it would have been enough to satisfy the recommendations of the service plan.

¶ 32     Respondent offered additional certificates into evidence at the hearing that reflected he completed parenting, anger management, GED, alcohol and drug abuse, money management, and forklift safety classes between May 9, 2025, and August 12, 2025, while he was incarcerated. However, he completed these classes after the last nine-month period had already elapsed. Courts cannot consider evidence outside of the relevant nine-month periods at issue in the State's petition pursuant to section 1(D)(m). *J.L.*, 236 Ill. 2d at 341. Though respondent made some progress after the third nine-month period elapsed, it was too little, too late under the Adoption Act. Moreover, this evidence shows that he was able to complete some services while in prison, yet he had not engaged in them during the preceding two years.

¶ 33     This evidence reflects that during the nine-month period between May 13, 2024, and February 13, 2025, respondent did not make reasonable progress toward reunification with his children. Though he was incarcerated during this time and his progress on some goals, such as in-person visitation, employment, and maintaining a residence, was certainly impeded by his incarceration, the Adoption Act makes "no exception for time spent in prison." *J.L.*, 236 Ill. 2d at 340. Moreover, respondent did not make any progress on other goals that were attainable during his incarceration. Other than attending at least four Alcoholics Anonymous classes in December 2024, respondent did not demonstrate that he was engaged in any other services or had substantially fulfilled his obligations under the service plan. See *C.N.*, 196 Ill. 2d at 217. He was thus no closer to having custody of his children returned to him at the end of this period.

¶ 34     Respondent therefore failed to make reasonable progress during any nine-month period—totaling two years—alleged in the petition to terminate his parental rights. As "the court

will not be able to return the child[ren] home in the near future, despite ample time and opportunity for compliance with the court's directives" (*Ta. T.*, 2021 IL App (4th) 200658, ¶ 55), the trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 35                                B. Best Interests

¶ 36        If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interests. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. See *In re D.T.*, 212 Ill. 2d 347, 364 (2004) ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). The burden on the State at the best-interests hearing is a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 366.

¶ 37        When determining a minor's best interests, the trial court must consider the following factors,

> "in the context of the child's age and developmental needs:
>
>> (a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>>
>> (b) the development of the child's identity;
>>
>> (c) the child's background and ties, including familial, cultural, and religious;
>>
>> (d) the child's sense of attachments, including:
>>
>>> (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
>>>
>>> (ii) the child's sense of security;

- 14 -

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child ***."

705 ILCS 405/1-3(4.05) (West 2024).

¶ 38　　　The trial court's best-interests determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 39　　　In this case, the trial court and the parties relied almost exclusively on the best-interests report, which was entered into evidence at the hearing. However, that report does not appear in the record on appeal. Though the State raised this issue in its brief on appeal, respondent inexplicably failed to address it in his reply brief and did not submit any motions in this court to supplement the record. Importantly,

"an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record

on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

Illinois courts have applied this principle in cases dealing with the termination of parental rights. See, *e.g.*, *In re I.L.-H.*, 2022 IL App (3d) 210424-U, ¶¶ 22, 24, 28 (affirming the trial court's unfitness finding and termination of the respondent's parental rights where the record was missing a hearing transcript critical to one of the claims on appeal).

¶ 40       The record here does not facilitate appellate review of the best-interests finding. For example, the record does not indicate where the children are living, how they have been faring in their placements, whether their foster parents are willing to adopt them, or any other critical information necessary for a full review of the children's best interests. Because respondent failed to ensure the record on appeal was complete and included the best-interests report, we must presume that the order entered by the trial court as to the children's best interests was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92. We remind counsel that it is critical to ensure the record is sufficiently complete to adequately present all issues raised on appeal in all types of proceedings, but especially in proceedings involving termination of parental rights.

¶ 41                                III. CONCLUSION

¶ 42       For the reasons stated, we affirm the trial court's judgment.

¶ 43       Affirmed.