2022 IL App (1st) 220219-U

SECOND DIVISION
September 27, 2022

No. 1-22-0219

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* O.S.-F., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Minor/Respondent-Appellee | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No. 18 JA 346 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| David F., | ) | The Honorable |
| | ) | Maxwell Griffin, Jr., |
| Father/Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Presiding Justice Lavin and Justice Howse concurred in the judgment.

**ORDER**

*HELD*: Trial court's findings of unfitness on each of three statutory grounds under the Illinois Adoption Act affirmed, as the State proved with clear and convincing evidence that respondent failed to maintain a reasonable degree of interest, concern, or responsibility; he behaved in a depraved manner; and he failed to make reasonable efforts to correct the conditions that were the basis for the removal and/or failed to make reasonable progress toward return during certain specific nine-month periods (750 ILCS 50/1(D)(b), (i), (m) (West 2018)).

¶ 1    This cause of action arises from the State's petition for adjudication of wardship of minor/respondent-appellee, O.S.-F. (O.).  Respondent-appellant David F. (respondent) is the biological father of O.  Following adjudicatory and dispositional hearings, the trial court found O. neglected due to injurious environment and respondent unfit pursuant to three separate statutory grounds; the court terminated parental rights upon a best interest determination and placed O. in the guardianship of the Department of Children and Family Services (DCFS) with the right to consent to adoption.  This appeal is made solely by respondent and challenges only the unfitness findings.[1]  He contends that the trial court's findings of unfitness on each of the statutory grounds were against the manifest weight of the evidence, arguing essentially that he was not referred or provided services for reunification and, alternatively, that he made substantial progress and completed all required services in spite of this.  He asks that we reverse the findings and order of unfitness.  The State and O.'s public guardian have filed appellee briefs.  For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3    O. is a boy who was born on August 2, 2011.  In April 2018, when O. was six years old, the State filed a petition for adjudication of wardship, alleging that he was neglected because his environment was injurious to his welfare (705 ILCA 405/2-3(1)(b) (West 2018)), and abused based on a substantial risk of physical injury other than accidental means (705 ILCS 405/2-3(2)(ii) (West 2018)).  The petition stated that O.'s mother had a prior indicated report

_____

[1] We note for the record that at the inception of this cause in our Court, respondent's appeal was consolidated with that of O.'s biological mother, Margaret S., regarding the same orders issued by the trial court.  However, their causes were later severed by order of this Court; mother's appeal proceeded separately and was recently affirmed. See *In re O.S.-F*, 2022 IL App (1st) 220218-U (unpublished summary order pursuant to Illinois Supreme Court Rule 23(c)(2), (4) (eff. Jan. 1, 2021)).  We refer to her herein only when necessary to present a complete factual background for the instant decision.

for close confinement, a significant history of abusing controlled substances, was currently incarcerated and charged with possession of a controlled substance, her paramour with whom she resided had a history of abusing controlled substances, and she had been uncooperative with DCFS. The petition further alleged that respondent had a history of domestic violence and was also currently incarcerated, without the option of bond, and charged with the attempted murder of his paramour.

¶ 4      DCFS prepared an integrated assessment (IA) report detailing the family's social history and service recommendations for both parents. With respect to respondent, a licensed clinical social worker and an assigned caseworker conducted his interview for the report at Cook County jail. At the outset, it was noted that respondent was readily engaged in the interview, but presented as a "poor historian," was "vague," and provided information that conflicted with other records and sources. Respondent's family was noted to have a history of mental health symptoms, substance abuse, and possible domestic violence. He and O.'s mother were married at the time of O.'s birth, but then had two intact family cases due to substance use and mental health issues. When O. was born, he experienced methadone withdrawal symptoms and respondent behaved "in an aggressive manner" toward him. Both respondent and O.'s mother were diagnosed with bipolar disorder, and a note in the report stated that doctors working with respondent at that time found him to have symptoms of mania including impulsivity, pressure speech, flights of ideas and paranoia, and that he changed quickly in mood from calm to confrontational; respondent was not receiving treatment. Respondent denied any domestic violence in his relationship with O.'s mother; however, O.'s mother reported that, following O.'s birth, respondent hit her while he was

3

intoxicated and she obtained an order of protection against him, and collateral sources reported additional domestic violence instances in that relationship. After being assessed at that time (during O.'s infancy), respondent agreed to participate in recommended family services, but never did.

¶ 5        The IA report further detailed that respondent left O.'s mother and began a relationship with his paramour, Ms. H.; she had a daughter from a previous relationship, and respondent and Ms. H. then had a son of their own. According to the report, a significant incident took place in February 2018 between respondent, Ms. H., and the two children in their home. Respondent, while intoxicated, became angry with Ms. H. and punched her in the face and kicked her repeatedly until she lost consciousness. He also bit her on her nose, on both arms, and in her vaginal area, and he hid her phone so she could not call for assistance. He then got a gun and pointed it at Ms. H. and their son, who was one-year old at the time, stating that he would " 'kill you all' " and that " 'no one is leaving this house.' " He allegedly pulled the trigger repeatedly, but the gun malfunctioned. He then struck Ms. H. in the face with the gun repeatedly. Respondent also "aggressively pushed" Ms. H.'s three-year-old daughter when she tried to intervene. Ms. H. was able to flee the apartment, but respondent followed her and pushed her down a flight of stairs. Police arrived and found Ms. H. " 'banging on the window [from inside the apartment] crying out for help.' " Police also found blood all over the apartment, on Ms. H. and on both of the minor children. Ms. H. suffered a broken nose, broken facial bones, bruising and swelling of her eye, bruising on her neck from being strangulated, and her body was covered in bite marks; she required surgery for her injuries. Police reported to have responded to domestic disputes between respondent and Ms. H.

4

multiple times within that past year, at least one of which resulted in Ms. H. having a black eye. Following this incident, respondent was arrested and charged with the attempted murder of Ms. H.

¶ 6    During his IA interview, respondent stated (contrary to police and police reports) that there were no occurrences of domestic violence between Ms. H. and him prior to the February 2018 incident. He explained that his interactions with her amounted to " 'normal stuff' " between the couple and that police officers " 'made [the February 2018 incident] out to be much worse than it was' and had 'scared her into making it sound like the end of the world.' " Additionally, he admitted that he had been arrested a number of times in the past, had been convicted of possession of a controlled substance (heroin), received methadone treatment sometimes, and often drank. He did not find treatment programs to be beneficial for him, as he did not like to be around others with addictions. With respect to his mental health issues, he reported that he did not believe his bipolar diagnosis was appropriate but, rather, that his drug withdrawal symptoms were mistaken for bipolar disorder and/or that his "bipolar behavior" was solely the result of his drug use and his " 'being a punk.' " He stated that he would be open to participating in psychological or psychiatric assessment upon his release from jail, but he did not want to participate in any such service now as he did not trust the mental health staff at the jail. Respondent reported his love and desire to reunify with O., along with his desire for O. to visit him in jail to deter him from future criminal behavior.

¶ 7    The IA report concluded by ordering the following services for respondent as essential for reunification with O.: substance abuse assessment and treatment with frequent random urinalysis and with providers aware of his history of falsifying toxicology testing of urine

samples, individual therapy, psychiatric assessment and medication monitoring, domestic violence and parenting coaching, and future consideration for family therapy (upon release). It further concluded that a clinical staffing was required to determine if it was in O.'s best interest to visit respondent during his incarceration, and mandated that any visitation ordered should be closely supervised.

¶ 8        On October 23, 2018, the trial court entered an adjudication order finding O. to be neglected due to injurious environment, based on his mother's arrest for possession of a controlled substance and admitted daily heroin use, respondent being in jail, and O. lacking a legal caretaker. On the same day, it also entered a disposition order finding respondent unable for some reason other than financial to care for, protect, train, or discipline O.[2] The court initially set a permanency goal of return home in 12 months and ordered DCFS to provide services consistent therewith. However, following a second permanency hearing in May 2021, the court changed that goal to substitute care pending a determination on termination of parental rights. It found that mother and respondent had "not made substantial progress toward return home [of O.] over a sustained period of time." It further found that there was no reason to believe O. would be able to be returned home "in the reasonably near future;" that O. has been in a non-relative, pre-adoptive foster home; and that respondent was still in prison. The court declared that DCFS "has made reasonable effort in providing services to facilitate achievement of the permanency goal," and concluded that placement of O. was necessary and appropriate.

---

[2] Mother was likewise found unable for some reason other than financial to care for, protect, train, or discipline O. in this same order.

¶ 9        In August 2021, the State sought the appointment of a guardian with right to consent to adoption for O. In its motion, the State alleged that respondent was unfit pursuant to three grounds of the Illinois Adoption Act (Adoption Act) (750 ILCS 50/1(D) (West 2018)): that he failed to maintain a reasonable degree of interest, concern, or responsibility under subsection (b); he behaved in a depraved manner under subsection (i); and he failed to make reasonable efforts under subsection (m) to correct the conditions that were the basis for the removal and/or failed to make reasonable progress toward return of O. during the specific nine-month periods of October 23, 2018 to July 23, 2019; July 23, 2019 to April 23, 2020; April 23, 2020 to January 23, 2021; and/or August 1, 2020 to May 10, 2021.

¶ 10        With respect to respondent's unfitness, the following evidence was presented at the subsequent hearing. First, the State sought to admit group Exhibit 1, which consisted of four items. Items 1A through 1C were certified convictions of respondent's felony drug convictions from 2002, 2005, and 2007, and item 1D was a certified criminal file with respect to the February 2018 incident between respondent and Ms. H. for which he was currently incarcerated. While respondent did not contest the admission of 1A through 1C, he did object to the admission of 1D, stating that, unlike the others, it was not a certified statement of conviction but appeared to be simply "a copy of the court file." He insisted that it did not state any convictions and contained handwriting from an unidentified author along with matters other than a certified statement of conviction and, thus, constituted inadmissible hearsay. In response, the State argued that while 1D did not look like the other items (1A through 1C), it clearly showed the court clerk's certification, all the charges against defendant resulting from the February 2018 incident, his plea of guilty to the second listed

7

charge of class 2 felony for aggravated domestic battery, and his sentence of four years in prison. The trial court allowed the admission of all the items in group Exhibit 1, overruling respondent's objection to 1D.

¶ 11    In addition to this documentary evidence, testimony was elicited from child case managers Elodie Betend and Abigail Fernandez. Betend worked at Jewish Children and Family Services (JCFS) and later transferred to Hephzibah Children's Association (HCA); she was involved in O.'s case while employed at both. She was first assigned to O. at JCFS when the permanency goal was return home within 12 months, and she reviewed the IA report, service plan, and other documentation including case files and notes. Betend testified that when she was assigned, respondent was in jail and remained there throughout the majority of her involvement, and there were no visits being conducted between him and O. at that time. Eventually, a staffing took place regarding the propriety of visitation, and Betend testified that a clinical decision letter was prepared. That letter, which was admitted into evidence, detailed that several JCFS supervisors on the case, along with O.'s clinician, found that visitation with respondent would be harmful to O., who had, of late, expressed increased thoughts of self-harm, suicide, and fear regarding respondent.

¶ 12    Betend stated that because of respondent's incarceration, she was unable to make direct service referrals for him to/for service providers, particularly those approved by her agency as meeting the required standards for services, since they were all outside providers. She averred that while she did not give the prepared case service plans to respondent directly since he was in jail, she did provide them to his attorney of record. She further averred that she did not converse with respondent about the plans over the phone, because he would call

8

her agency early in the morning before she began work; she would attempt to call him back during work hours but could not reach him. She did speak to him directly about the plans and required services during court hearings concerning O. However, she testified that respondent would be "very agitated" and "very aggressive" in person during their conversations and would "talk over" her, making it "very difficult to communicate."

¶ 13    Betend further testified that, although she left JCFS in January 2020 and went to HCA, she was again assigned to O.'s case when it was transferred there in May 2021. She stated that in June 2021, she had a conversation with respondent, who was still in jail, during which he told her he would be paroled at the end of the month and wanted to engage in recommended services. Betend stated that respondent also told her he would provide her certificates showing the many services he completed while incarcerated.

¶ 14    On June 30, 2021, Betend attended a staffing with, among others, respondent who had now been released from jail, his attorney, and Dr. Michael Fields, who identified himself as respondent's counselor and therapist. Betend again noted, however, that because respondent had been incarcerated, no referrals for him had been made to a specific provider, nor were any documents regarding O.'s case—including the IA report containing the recommended services for respondent's reunification with O., service plans, or other agency reports—ever tendered to any service provider for respondent. Accordingly, Betend offered to identify and connect respondent with service providers, but he told her he did not trust her and would find his own. Betend made note of this and told respondent that she would accordingly need signed releases so that information could be provided to the service providers he chose and they could communicate with her. Betend testified that respondent told her he was not

9

willing to give her the information she needed to obtain releases and speak to his providers, and instead told her to contact Dana Lawrence, his assigned caseworker upon parole. Betend, however, could not speak to her without a release either, and again asked respondent in July 2021 for the necessary releases. Respondent again told Betend not to speak to him, but only to Lawrence and his attorney. Betend's notes confirmed she contacted respondent's attorney and was eventually able to obtain some releases; she was not, however, ever able to obtain one from respondent for Cook County jail or any services he allegedly received there. Betend additionally stated that respondent continued to refuse to engage in any conversation with her directly regarding any services. For example, a situation occurred regarding respondent's residence; Betend testified she had to conduct a search to find an address for him as he would not provide it to her, and then discovered he was not living there upon his parole. Respondent subsequently provided Betend with a different address and then told her to contact Lawrence, as he was "too busy" to speak with Betend himself and that is why he had "hired" Lawrence.

¶ 15     Betend recounted that, again, she had not provided a copy of the IA report to any service provider for respondent while he was incarcerated, as she was unable to do so since he was incarcerated. She did, however, provide a copy to Lawrence once respondent was paroled and after he had provided Betend with a release. Betend stated that she was never provided a name or entity with whom to communicate from respondent or anyone regarding his services while he was in jail, and that any service provider would need the IA report to assist respondent in completing the required services. Betend noted that Cook County jail generally offered some services, but it was uncertain whether they met the criteria required

for respondent. She eventually did obtain the certificates respondent had promised showing service he allegedly completed while in jail. However, upon her review of them, she determined that respondent was still in need of all the services recommended to him, including individual therapy, a domestic violence assessment, a substance abuse assessment, parenting services and a psychiatric assessment, and there was no recommendation from any service provider that visitation between respondent and O. was now appropriate. Betend explained that she called the jail several times, but no one returned her calls and she was thus unable to verify or determine what the services respondent participated in entailed or whether they met the criteria for reunification with O. pursuant to the IA report. For example, while a certificate indicated that respondent participated in therapy, he provided Betend with no information detailing the type of therapy or whether it was the type required by the IA report. Betend also testified that she has been unable to monitor respondent's sobriety, particularly since his release.

¶ 16    Fernandez testified that she worked at JCFS and took over O.'s case in February 2020. She participated in a transitional staffing with Betend before her departure and reviewed, among other pertinent records, case notes and the IA report, which included the services identified for respondent. She affirmed that respondent was incarcerated during her entire involvement in the case and, as such, she was not in a position to make service referrals for him, as the potential providers were all outside providers. She was able to have contact with respondent via an IPhone every couple of months, as organized through the jail and coordinators; during this time, Fernandez discussed services with respondent, who promised he would mail her certificates of completion, but she never received any. Fernandez

continued to ask respondent for these certificates and was never able to identify or speak with any service providers for any services in which respondent said he engaged. Like Betend, Fernandez averred there was no visitation between respondent and O. when she was on the case and that this was supported by a clinical decision. There were also notations that respondent had been inappropriate with O. during phone calls between the two. She described that respondent had sent her some letters intended for O.; she shared these with her supervisor, who passed them on to O.'s clinicians to determine their appropriateness. She testified that the letters were never sent to O.

¶ 17    Fernandez further testified that in October 2020, during a video call with respondent, they again discussed services and respondent quickly waved some papers across the screen claiming they were certificates of completion and read some things off of them, of which Fernandez made note; however, again, he did not provide these to her and, thus, she could not verify them. Also, during this video call, Fernandez showed respondent a video of O. O. had discussed with Fernandez that he wanted to talk to the judge in his case, so he decided to make a video as a means to do so and gave it to Fernandez. As Fernandez anticipated presenting this to the court, she first wanted to show it to respondent. In the video, O. expressed his desire to be adopted by his foster family. Fernandez stated that respondent was very upset and, after watching it, expressed his belief that O. had been coerced by those involved in the case, including JCFS, the foster parents and various doctors. Fernandez averred that when she left JCFS in November 2020, the services required of respondent were still necessary and outstanding.

¶ 18      Respondent testified on his own behalf.  He stated that he was incarcerated when he learned that O. had been removed from his mother's care.  He recalled participating in the IA interview while in Cook County jail, but averred he was not contacted again nor ever received any service plans while incarcerated even though he attempted to contact JCFS repeatedly.  However, respondent admitted that he did receive service plans each time he went to court for this case, and that he met with Betend there and discussed services with her.  He also admitted that he was fully aware of the services required of him for reunification.  According to him, these included "[d]omestic violence, individual therapy, group therapy, trauma-informed therapy, parenting classes, a whole litany of stuff."   He averred that he "attempted to do all these things and [he] did" them all, despite JCFS' failure to provide service referrals.  Respondent recounted that he attended "a rotating schedule of different counseling and therapy classes" while incarcerated, including group and individual therapy, art therapy, Narcotics- and Alcoholics-Anonymous meetings, and "parenting-type classes."  He also described at length that he took part in college classes, "chess classes," a statistics and analysis class, a poetry class, a theology class, a "restorative justice program" and others.  He averred that he completed these and received certificates.  The certificates, which were those he eventually provided to Betend, were submitted to the court.  Respondent expressed that he did all this in an effort to improve himself, "get [his] life together," and "meet the terms of the integrated assessment."  He also averred that he remained sober while incarcerated and has maintained his sobriety.  Finally, with respect to his contact with O., he recounted that before he was incarcerated, he shared 50/50 custody of O. with O.'s mother and they engaged in many activities together.  He then had regular contact with O. while he

13

was incarcerated but before JCFS became involved, including telephone calls and video visits. He averred, however, that after JCFS became involved, he had no contact with O.; for example, he wrote letters to O. and would send them to Betend and/or Fernandez, but never heard back from O.

¶ 19     On cross-examination, respondent admitted to the February 2018 incident, acknowledged two children were present during it, and confirmed that he broke Ms. H.'s nose and skull. However, he refused to admit that he caused any injury to her vaginal area. He further insisted this was the first instance of domestic violence between him and Ms. H., and that he did not consider any arguments he had with her previously to constitute domestic violence. Similarly, he stated that "[t]here was never any domestic violence" with O.'s mother and whatever report she made to the contrary "was clearly not real." When asked if he was aware that the IA report contained information about instances of domestic violent between him and O.'s mother and him and Ms. H., respondent stated that "there's all kinds of information that's erroneous in that integrated assessment that I couldn't do anything about.," and instances of such violence detailed therein "never happened" and were "completely fabricated" because he otherwise would have been charged accordingly but never was. He admitted that while incarcerated, he participated in a zoom call with Fernandez, a DCFS case management review meeting, and a parenting team meeting.

¶ 20     At the close of the hearing, the court issued its ruling regarding fitness. It noted that during his IA assessment, respondent denied and/or minimized his "unhealthy" behavior towards O.'s mother and Ms. H., and how this would impact O. It also detailed the services respondent was assessed to need, all of which were noted in the IA report. And, it

acknowledged the testimony of Betend and Fernandez, O.'s two primary caseworkers. Based on all that was presented, the court held that the State "met its burden of proof by clear and convincing evidence that" respondent was unfit. In support of its determination, the court pointed out that although respondent was incarcerated, this did not relieve him of his obligation to engage in services. With respect to these, it noted that the services assigned were designed specifically to address the needs that were established in the IA report for this particular case. While the court acknowledged the certificates of participation presented by respondent with respect to "various services," it cited that it had "no way *** to tell exactly what was addressed in these services and no meaningful way *** to assess that any of the service needs that were identified in the integrated assessment were addressed through these services." Accordingly, the court, noting respondent's diligence in attending the classes he did, stated it could not find that he failed to make reasonable efforts to correct the conditions that were the basis of O.'s removal. However, it concluded that, despite this, "there is no evidence or insufficient evidence to suggest that he had made reasonable progress towards return" of O. during the specified time periods.

¶ 21        Next, the court discussed the element of a finding of unfitness based on depravity. With respect to this ground, it found defendant unfit and that the State had met its burden to show depravity via respondent's convictions. Citing that this ground encompasses a rebuttable resumption, the court went on to discuss respondent's evidence to the contrary, namely, his rehabilitation attempts and his understanding of his wrongful actions. The court stated, however, that "there is not a report of any kind that I have been tendered from any type of clinician that establishes that [respondent] has made progress, has addressed the numerous

issues raised in the integrated assessment *** [or shows that respondent] has been rehabilitated." Therefore, because the court had not "been given evidence that is sufficient to rebut the presumption," it concluded that respondent was unfit based also on depravity.

¶ 22     Finally, the court found respondent unfit based on a third ground, his failure to maintain a reasonable degree of interest, concern, or responsibility as to O. The court stated that while one could say this was due only to his incarceration, it made clear his incarceration was due to his own actions and that he was responsible for their consequences, including any inability that may have result from it in "fulfilling his responsibility to" completing services in order to reunify with O.

¶ 23     A best interest hearing followed. Briefly,[3] the testimony and evidence presented demonstrated that O. was placed in a non-relative foster home in 2018 and has remained there since. The home is safe and appropriate and there are no signs of abuse or neglect. O. attends school, receives special education services and has an individualized education plan. O.'s medical needs are being met, and he engages in individual therapy and medication monitoring. Foster parents have a close and bonded relationship with O. and have expressed a desire to adopt him. O. has expressed to his caseworkers that he does not want to leave his foster home but, instead, wants to live with his foster parents forever. At the end of the hearing, the court concluded that it was in O.'s best interest to terminate parental rights and placed him in DCFS guardianship with the right to consent to adoption.

¶ 24                                  ANALYSIS

---

[3] As respondent does not appeal the best interest determination, only a limited summary of what occurred is necessary.

¶ 25    As noted, respondent's sole contention on appeal is that each of the trial court's three separate findings of unfitness were all against the manifest weight of the evidence, for various reasons. He asserts that accordingly, this Court should reverse all of those findings. We disagree.

¶ 26    At the outset, we wish to make one legal principle very clear. It is well established that the grounds for finding parental unfitness under section 1(D) of the Act stand independently of each other. See *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004); *In re E.O.*, 311 Ill. App. 3d 720, 726 (2000). A finding under any one of the grounds listed in section 1(D), standing alone, is sufficient to establish unfitness. See *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). Accordingly, when a trial court makes a finding of unfitness under one of its grounds, we may affirm that finding of unfitness regardless of the court's findings with respect to any other ground asserted in the petition at issue. See *Jaron Z.*, 348 Ill. App. 3d at 259, citing *E.O.*, 311 Ill. App. 3d at 726, and *In re C.L.T.*, 302 Ill. App. 3d 770, 772 (1999) ("a finding of parental unfitness may be based on evidence sufficient to support any *one* statutory ground" (emphasis in original)).

¶ 27    Having made this clear, we now turn to the merits of the instant appeal.

¶ 28    Respondent first asserts that the trial court's finding of unfitness pursuant to ground (m) was against the manifest weight of the evidence because he was not referred to or provided services and, thus, was not afforded the opportunity to make the requisite progress required for reunification. Principally, he alleges that DCFS and the agencies assigned to this matter never identified services and service providers for him, did not inform him that any services he received on his own needed to be specifically designed to address the concerns noted in

17

the IA report, and never provided a copy of that report to anyone in order for him to receive services. He then alternatively insists that, despite their "abdicat[ion of their] responsibility to the family for the goal of reunification by failing to provide [him] with any services whatsoever," should we find that such services were provided, he did, indeed, make "the requisite progress" for which he is entitled to reversal pursuant to ground (m).

¶ 29   Subsection (m) of section 1(D) of the Adoption Act examines the "reasonable efforts" and "reasonable progress" a parent must make toward the return of the child during any nine-month period following the adjudication of neglect or abuse. See 750 ILCS 50/1(D)(m) (West 2018); *In re S.J.*, 407 Ill. App. 3d 63, 67 (2011). "Reasonable efforts" relates to the correction of the conditions that led to the child's removal from the parent and are adjudged on a subjective basis upon a consideration of what is reasonable for that particular parent. See *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21; *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). Under this analysis, the court must determine whether he has made earnest and conscientious strides toward making the cited corrections. See *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002). In the instant cause, as respondent points out and the record makes clear, the trial court, with respect to reasonable efforts, concluded as follows: "I cannot say that [respondent] failed to make reasonable efforts to correct the conditions that were the basis for the removal" of O. In support, the court noted the many classes respondent took and activities in which he participated, verified by several certificates. Obviously, respondent does not challenge this finding, and neither do the State nor the public guardian on appeal. We mention this here because, we, too, would agree that respondent did, indeed, make reasonable efforts to correct the conditions that were the basis of O.'s removal.

18

Respondent testified at length that he tried to better himself while incarcerated by taking college classes, addressing his substance abuse issues, and participating in other programs, including poetry, theology, and chess as a means to change his past behaviors. None of this is lost on us; we both commend and praise respondent for the efforts he made in light of the circumstances in which he found himself.

¶ 30    However, ground (m) does not only focus on a parent's reasonable efforts but, conjunctively, includes a review of his "reasonable progress" toward return home of the child, as well. Separate and distinct from reasonable efforts, "reasonable progress" relates to the amount of progress measured from the conditions existing at the time of removal and, thus, is adjudged, unlike reasonable efforts, on an objective basis. See *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21; *Daphnie E.*, 368 Ill. App. 3d at 1067. It focuses on the steps the parent has taken toward the goal of reunification. See *D.F.*, 332 Ill. App. 3d at 125; accord *In re C.N.*, 196 Ill. 2d 181, 214-16 (2001). Under this analysis, a court examines the parent's compliance with the service plans and directives in light of the conditions that led to removal, as well as subsequent conditions that would prevent the court from returning custody to the parent. See *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. In fact, a parent's compliance with service plans and court directives has been called the "benchmark for measuring" reasonable progress in relation to ground (m). *C.N.*, 196 Ill. 2d at 214-16. Some demonstrable movement toward the goal of reunification on the part of the parent is required. See *C.N.*, 196 Ill. 2d at 211. Ultimately, it is when it can be concluded that the child's return to the parent in the near future is feasible that reasonable progress may be determined to have been

19

achieved by the parent. See *Daphnie E.*, 368 Ill. App. 3d at 1067; accord *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21.

¶ 31    In examining a decision to terminate parental rights based on questions regarding reasonable progress, the reviewing court will defer to the trial court's disposition, as this involves factual findings and credibility assessments that the trial court is in the best position to determine. See *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19; *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). Thus, the trial court's decision will not be disturbed unless it is against the manifest weight of the evidence. See *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19; *Deandre D.*, 405 Ill. App. 3d at 952; accord *C.N.*, 196 Ill. 2d at 208. This occurs only when the opposite conclusion is clearly evident from a review of the evidence presented. See *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19; *Deandre D.*, 405 Ill. App. 3d at 952; accord *Gwynne P.*, 215 Ill. 2d at 354. In addition, we note that " ' "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." ' " *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, quoting *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203 (2008), quoting *Daphnie E.*, 368 Ill. App. 3d at 1064; accord *Gwynne P.*, 215 Ill. 2d at 354. There is a "strong and compelling presumption in favor of the result reached by the trial court" in child custody cases. *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 324 (2005).

¶ 32    Based upon our thorough review of the record in the instant cause, we cannot conclude that the trial court's decision finding respondent unfit based on his failure to make reasonable progress toward the return of O. was against the manifest weight of the evidence. Rather, we find that the trial court's determination was wholly proper.

¶ 33        Ground (m) puts in place a timeline, as a parent's conduct is examined for reasonable progress pursuant to nine-month periods. Accordingly, courts are to consider evidence occurring only during the relevant nine-month periods, and we may affirm a finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period. See *In re J.L.*, 236 Ill. 2d 329, 340 (2010); accord *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. Most significant to the instant case, no exceptions are afforded to incarcerated parents under subsection (m). See *J.L.*, 236 Ill. 2d at 343. That is, a parent's time spent in prison does not toll any nine-month period during which reasonable progress must be made. See *J.L.*, 236 Ill. 2d at 343 ("time spent incarcerated is included in the nine-month period during which reasonable progress must be made" under subsection (m)).

¶ 34        Respondent here was found unfit during four different nine-month periods: October 23, 2018 to July 23, 2019; July 23, 2019 to April 23, 2020; April 23, 2020 to January 23, 2021; and August 1, 2020 to May 10, 2021. First, and most significantly, the record demonstrates that during all of these periods, respondent was incarcerated. They all preceded his release, which did not occur until late June 2021. During each of these periods, there was no indication when, or even whether, respondent was going to be release. Accordingly, it could not be concluded, during any of those periods, that O.'s return home to respondent in the near future would be feasible. Without such a determination, it could not be said that respondent achieved reasonable progress pursuant to ground (m).[4] See *Daphnie E.*, 368 Ill. App. 3d at

---

[4] While it could be said that return home of O. to respondent in the near future may have been feasible during the last nine-month period of August 1, 2020 to May 10, 2021, as that period expired only approximately six weeks before his release from jail, this is of no consequence as such an inference surely does not apply to the remaining three cited nine-month periods, only one of which is needed to support a finding of failure to make reasonable progress pursuant to ground (m).

1067; accord *Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21 (return in the near future must be feasible in order to support a finding that parent achieved reasonable progress pursuant to ground (m)).

¶ 35     In addition, the record makes clear that respondent knew what services were required of him. Betend and Fernandez testified that they reviewed service plans with respondent. Betend specified that she provided respondent with copies of his service plans whenever she saw him in court proceedings in relation to O., and gave these and the IA report to his attorney of record while he was in prison. Fernandez also detailed conversations she had with respondent about his service plans while he was incarcerated. Indeed, during his own testimony, respondent admitted that all this was true, and confirmed that he participated in a zoom call with Fernandez about services, as well as a case management review meeting and a parenting team meeting. Moreover, respondent clearly testified that he was fully aware of the services required of him for reunification. He even listed these for the court, including domestic violence assessment, individual and group therapy, trauma-informed therapy, parenting classes and, according to him, "a whole litany of stuff." He then testified with respect to several programs in which he participated, including different counseling and therapy classes, like art therapy, chess and statistics classes, poetry, theology, and "parenting classes." He averred that these were his attempts "to do all these things" to satisfy the services requirements and that he did them for exactly that reason.

¶ 36     Again, we in no way minimize respondent's efforts. However, and again, his subjective efforts are not the same as the objective measure required for a finding of reasonable progress pursuant to ground (m). The IA report and service plans specified the services

22

respondent was required to complete; based on the evidence presented, including respondent's own testimony, there is no question here that he knew what these were. These were the benchmarks to measure his reasonable progress. He did not complete them. While he made efforts in other ways, the certificates he provided simply do not show proof of the demonstrable movement toward the goal of reunification that was required specifically for him under his specific service plans. For example, the certificates reflecting his participation in mental health treatment and "parenting-type classes," which respondent noted during his testimony, do not provide any information as to what those programs involved or whether they met the specific needs determined for respondent in the IA report and service plans. Namely, did he received the appropriate individual therapy focused on trauma as advised and required in these plans? Were those who administered his drug testing aware that he needed to be monitored while being tested due to prior episodes during which he provided false urine samples, as detailed in the IA report? Were the parenting classes truly focused on parenting skills as required by the service plans, or solely on the maintenance of a father-child relationship while father is in prison, as respondent described during his testimony?

¶ 37     Further, there is also no evidence that he participated in a domestic violence assessment with a particular focus on the victim, as was ordered. We take particularly serious note of this. The IA report was replete with instances of domestic violence involving respondent, and an assessment of such was ordered in his plans. Yet, throughout his testimony, respondent adamantly maintained that there was never any domestic violence between him and O.'s mother, and only one domestic violence incident took place between him and Ms. H. He fervently insisted that any such instances were "clearly not real," "never happened,"

and were "complete fabricated." He similarly refused to admit the extent of the injuries he caused Ms. H. (which required surgery), and insisted the police made more out of the February 2018 incident (for which he was charged with attempted murder) than it really was. All of respondent's testimony in this regard was in direct contradiction to police reports, medical reports, and the restraining order O.'s mother obtained against him.

¶ 38   Respondent argues that he was never referred for services and services were not provided to him so he could complete them in order to show reasonable progress. However, this situation was of respondent's own making. That is, respondent was in jail—during all four of the cited periods. This was the consequence of his actions during the February 2018 incident that took place between him and Ms. H. As Betend and Fernandez testified, they simply could not make referrals for services for respondent because of this very reason; as he was incarcerated, there was no way he could have participated in any services as the necessary service providers to whom they would have referred him for his particular needs were outside providers. See *J.L.*, 236 Ill. 2d at 343; *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89 (circumstances of a parent's own making that prevent him from making reasonable progress by limiting his ability to engage in services, including imprisonment, are "irrelevant" to the objective standard for ground (m)). It is admirable that respondent used his time while in prison to better himself, and this, as the trial court noted, showed reasonable efforts. But, without more—without showing how these classes or programs or activities satisfied his specific service plan requirements, of which he undeniably knew—we cannot find that the trial court's determination that respondent failed to show reasonable progress

during the nine-month periods cited, which saw him in jail without release in the near future, was against the manifest weight of the evidence.

¶ 39    Having so affirmed the finding of unfitness pursuant to ground (m), our decision may properly and legally end here. See *Jaron Z.*, 348 Ill. App. 3d at 259 (reviewing court may affirm finding of unfitness on any one statutory ground and need not address any other ground asserted). However, were our finding incorrect (which it is not), and more importantly, in an effort to preserve a complete record as this matter involves the critical consequence of termination of respondent's parental rights to O., we address his remaining contentions, albeit briefly.

¶ 40    Respondent goes on to challenge the trial court's determination of his unfitness pursuant to ground (i), depravity. He asserts that the court abused its discretion in admitting exhibit 1D because it was hearsay; he then attributes error to the court for requiring him to present "sufficient" evidence to rebut a presumption of depravity; and finally, he insists that regardless of all this, the State failed to prove he is depraved by clear and convincing evidence. Respondent is incorrect in each regard.

¶ 41    Under subsection (i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2018)), a parent may be found unfit if he is depraved, *i.e.*, he displays " ' "an inherent deficiency of moral sense and rectitude" ' " as shown by a series of acts or a course of conduct. *In re Shanna W.*, 343 Ill. App. 3d 1155, 1166 (2003) (quoting *In re J.A.*, 316 Ill. App. 3d 553, 561 (2000), quoting *Stalder v. Stone*, 412 Ill. 488 (1952)); accord *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 23. A presumption of depravity arises if the parent has been criminally convicted of at least three felonies, at least one of which took place within five years of the filing of the

petition seeking termination of parental rights. See *Addison R.*, 2013 IL App (2d) 121318, ¶ 23 (citing section 1(D)(i)); *Shanna W.*, 343 Ill. App. 3d at 1166. This presumption is rebuttable, and the parent is able to present evidence showing that, despite his convictions, he is not depraved. *Addison R.*, 2013 IL App (2d) 121318, ¶ 24; *Shanna W.*, 343 Ill. App. 3d at 1166. Once he produces evidence opposing the presumption, the presumption ceases to operate and the trial court is to determine the issue of depravity based on all the evidence presented. *Addison R.*, 2013 IL App (2d) 121318, ¶ 24. Ultimately, great deference is given to a trial court's finding of depravity, as it is in the best position to scrutinize the parent's character and credibility, and its decision will not be overturned unless it is against the manifest weight of the evidence. *Addison R.*, 2013 IL App (2d) 121318, ¶ 26; accord *Shanna W.*, 343 Ill. App. 3d 1166-67.

¶ 42     In the instant case, the State presented a presumption of respondent's depravity via group Exhibit 1. Within that group, exhibits 1A through 1C, which respondent does not challenge, provided proof of three felony drug convictions, from 2002, 2005 and 2007. Pursuant to statute, the State needed to show one felony conviction within five years of the filing of the petition seeking termination of parental rights. It did so with exhibit 1D, detailing respondent's arrest, conviction and imprisonment that resulted from the February 2018 incident between him and Ms. H. That exhibit consisted of five pages, all dated October 30, 2019, the day respondent was adjudged guilty of aggravated domestic battery. Pages one and two are clearly marked as respondent's criminal disposition sheets. They have respondent's name on them, his case number, his court date, and the circuit court clerk's certification. As respondent points out, there is handwriting on the pages; however, it is legible and details the

disposition of the matter, namely, that, while he was charged with multiple offenses including attempted murder, he pled guilty to "ct 2 only," aggravated domestic battery, and was sentenced to four years in prison and four years of mandatory supervised release. Critically, these pages bear the dated stamp of the clerk of the circuit court. The third page of the exhibit is respondent's mittimus, again confirming his conviction for aggravated domestic battery, its status as a class 2 felony, and his four-year sentence; this page is also date-stamped by the clerk. Additionally, the final two pages, also date-stamped, are respondent's jury trial waiver (which again states his sentence) and his presentence report waiver. When taken together with the other exhibits in the group, the presumption of respondent's depravity under the statute is clear.

¶ 43 Contrary to respondent's contention, exhibit 1D did not constitute hearsay of any kind and the trial court did not abuse its discretion in admitting it into evidence. It is clear from the record that the contents of exhibit 1D constitute true, public court records, files and reports all certified, stamped and signed by the circuit court clerk, and all admissible under various rules of evidence. See, *e.g.*, Ill. R. Ev. 803(8) (public agency records and reports are exception to hearsay); Ill. R. Ev. 902 (extrinsic evidence of authenticity is not required for admissibility of certified copies of public records); 735 ILCS 5/8-1202 (West 2020) (court entries and records may be proved certified under signature of clerk). That they may have appeared "different," in respondent's words, than exhibits 1A through 1C which detailed his other convictions does not render them inadmissible under evidentiary principles or somehow inapplicable in a depravity determination. We find no abuse of discretion in the trial court's admission of exhibit 1D that would mandate reversal of its unfitness finding

27

pursuant to ground (i). See *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 85 (admissibility of evidence is within sound discretion of trial court); accord *In re J.V.*, 2018 IL App (1st) 171766, ¶ 204.

¶ 44      Moreover, we do not find that the trial court improperly shifted the burden of proof, as respondent asserts. In our view, he misreads the record. In support of his claim, respondent isolates and quotes a phrase from the trial court's colloquy in which it stated that it had not "been given evidence that is sufficient to rebut the presumption" of depravity, and focuses solely on the word "sufficient," claiming the court was requiring him to provide a certain, higher burden of evidence. However, when examining the colloquy regarding depravity in its entirety, this interpretation is not supported. Immediately prior to the phrase cited by respondent, the court properly outlined the requirements of depravity and explained that, even though it can be presumed based on evidence presented by the State, it can be rebutted by the parent. It then discussed the evidence respondent presented to rebut the presumption established by the State, which it noted comprised respondent's rehabilitation attempts (the certificates) and his understanding of his wrongful actions. The court then noted, however, that "there is not a report of any kind that I have been tendered from any type of clinician that establishes that [he] has made progress, has addressed the numerous issues raised in the integrated assessment *** [or shows that he] has been rehabilitated." It repeated this moments later when concluded that it "just d[idn't] have any reports that have been tendered that [it] can point to or rely on and say [respondent] has been rehabilitated." It was immediately after this that the court made the comment respondent now cites.

¶ 45    When read in its full context, the court was not imposing a legal standard of "sufficiency" on respondent regarding depravity. It was merely using the word "sufficient" in a colloquial sense, meaning enough or adequate. The essence of the court's colloquy was this: the State raised the presumption of depravity via the exhibits; respondent had the opportunity to rebut this presumption; other than the generic certificates and his testimony that he tried to better himself while in jail, respondent did not provide any evidence that he was rehabilitated. The court was not required to simply accept respondent's testimony as true, and we have already discussed at length that the certificates he presented did not meet the specific requirements of his service plans and IA report. He did not provide anything else—no letters, no reports, no certificates directed to the specific requirements of his services plans or IA—to challenge the presumption of depravity at all, let alone "sufficiently." See, *e.g*, *Shanna W.*, 343 Ill. App. 3d at 1167 (evidence of rehabilitation of depravity "can only be shown by a parent who leaves prison and maintains a lifestyle suitable for parenting children safely;" "[r]eceiving a few certificates for completing basic services in prison, while commendable, is not a difficult task and does not show rehabilitation"); accord *In re A.M.*, 358 Ill. App. 3d 247, 254 (2005); see also *Addison R.*, 2013 IL App (2d) 121318 ¶ 30 (efforts in prison such as participation in programs and college courses were not enough to rebut presumption of depravity).

¶ 46    Furthermore, even assuming that respondent did rebut the presumption of his depravity raised by the State (which he did not), the record does not support his conclusion that the State failed to prove his depravity by clear and convincing evidence. As noted, if respondent had rebutted the presumption, then the court was required to determine the issue based on all the evidence presented. The court specifically declared it had no evidence to show

respondent's rehabilitation, while at the same time all the statutory elements of depravity had been met by the State. The evidence presented, then, more than supported the court's finding that the State proved respondent's depravity by clear and convincing evidence and, therefore, respondent's unfitness may be properly affirmed on this this ground, as well.

¶ 47 Lastly, respondent challenges the court's finding of unfitness pursuant to ground (b). He asserts that the agencies in this cause "thwart[ed his] contact with O." when they became involved and that the trial court did not properly consider this, along with his persistent efforts in attempting to maintain contact with O. (including letters, cards and phone calls), in evaluating this ground.

¶ 48 A parent may be found unfit pursuant to ground (b) if he fails "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2018). The language specified in this ground is disjunctive and, therefore, any of its three elements–the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare–may be considered on its own as a basis in determining whether the parent is unfit. See *Jaron Z.*, 348 Ill. App. 3d at 259, citing *C.L.T.*, 302 Ill. App. 3d at 773. Unlike ground (m), ground (b) has no time constraint which limits a court's consideration of a parent's fitness, and a court may consider the parent's conduct in this respect *in toto* without being forced to analyze only certain time periods of the parent's behavior. See *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 21, citing *In re Dominique W.*, 347 Ill. App. 3d 557, 567-68 (2004). The analysis is to take place on a subjective basis. See *Gwynne P.*, 346 Ill. App. 3d at 591, *aff'd* 215 Ill. 2d 340 (2005). Thus, as respondent points out, this ground does not focus on a parent's success but, rather, the reasonableness of his

efforts and is to take into account his difficulties and circumstances. See *Jaron Z.*, 348 Ill. App. 3d at 259; accord *E.O.*, 311 Ill. App. 3d at 726-27 (trial court should focus on parent's efforts in light of his particular circumstances, and not on whether these efforts were successful, *per se*). However, simply because a parent demonstrates some interest or affection towards his child does not render him fit under this ground; rather, his interest, concern and/or responsibility must be reasonable. See *Jaron Z.*, 348 Ill. App. 3d at 259; *E.O.*, 311 Ill. App. 3d at 727. Moreover, "[n]oncompliance with an imposed service plan *** and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b)." *Jaron Z.*, 348 Ill. App. 3d at 259. Just as with the prior grounds discussed in this decision, great deference is afforded to the trial court's determination with respect to a finding pursuant to ground (b), and it will not be reversed unless it is against the manifest weight of the evidence. See *Jaron Z.*, 348 Ill. App. 3d at 259-60.

¶ 49   We cannot ignore the elephant in the room. By his own admission, respondent was incarcerated, as a consequence of his own actions, from February 2018 (before O. was removed) to the end of June 2021. A parent's behavior that impedes his ability to maintain contact, visits or responsibility for his child may well be considered in assessing fitness under ground (b). See, *e.g.*, *In re Shauntae P.*, 2012 IL App (1st) 112280; see also *In re M.J.*, 314 Ill. App. 3d 649, 657 (2000). Clearly, respondent's incarceration made it impossible for him to maintain his responsibility for O. This, alone, is sufficient to uphold the court's unfitness finding pursuant to ground (b).

¶ 50        With regard to his complaints that the agencies involved herein prevented his contact with O., none warrants reversal here.  Even subjectively considering respondent's circumstances, our Court has been clear that "the ultimate responsibility for maintaining a reasonable degree of interest, concern, and responsibility" for a child "rest[s] with respondent."  *Konstantinos H.*, 387 Ill. App. 3d at 204.  This is not a case where a parent had difficulty in obtaining transportation because he lives far from the child's residence, or he is impoverished, or agencies were actively depriving him of visits or contact due to indifference or inadequacy of the delivery of services.  See, *e.g.*, *Shauntae P.*, 2012 IL App (1st) 112280, ¶ 102 (and cases cited therein).  None of this is evident in the record.  To the contrary, what is present in the record is more than sufficient evidence to support this finding of respondent's unfitness.

¶ 51        For example, while respondent may have had contact with O. when he first went to jail and O. was living with his grandmother, this occurred while the case was unmonitored by any agency.  Respondent is correct that once JCFS and HCA became involved, this all changed; however, it did so for various critical, and clinically valid, reasons.  As caseworkers Betend and Fernandez testified, determinations regarding contact and visitation were not at their solitary whim, but rather, involved staffings and discussions had among case managers, case supervisors, foster care clinicians, foster care supervisors, and clinical supervisors overseeing O.'s case.  These authorities determined, at various points throughout this cause's progression, that contact and visits between O. and respondent were inappropriate and harmful to O.  This was based on O.'s increasing thoughts of self-harm and suicide, anxiety, and fears of respondent as expressed by him to his caregivers, caseworkers, and staff at

school. The record reveals he actually required medical and therapeutic treatment for these. In addition, Betend and Fernandez testified that phone calls between respondent and O. became inappropriate as respondent began using inappropriate language, and again, their supervisors and O.'s clinicians further determined, after multiple instances of review, that the letters respondent wanted to send O. were also inappropriate.

¶ 52    In addition, the fact remains that respondent did not engage in required services. He did not do so while incarcerated, and there is no evidence he did so upon his release. In fact, Betend's testimony was that she offered him assistance upon his release to connect him with authorized service providers, but he refused on multiple occasions, stating he would find his own. He then refused, repeatedly, to give her the releases she needed to communicate with them, still did not conform to the service plans, and would not even tell her where he was actually living so she could contact him. Respondent's failure to cooperate throughout this cause was not simply stubborn, but also contrary to any alleged "effort" he now insists we must accept as a basis to reverse this unfitness finding. We do not agree with his insistence, and contrarily hold that the trial court's finding of unfitness based on ground (b) was also proper.

¶ 53                                    CONCLUSION

¶ 54    Accordingly, for all the foregoing reasons, we affirm the judgement of the trial court finding respondent unfit pursuant to grounds (m), (i) and (b) of the Adoption Act and terminating his parental rights to O.

¶ 55    Affirmed.

33